**RICHARD SUBARU, INC.**

v.

**SUBARU OF NEW ENGLAND.**

**No. 3:91cv378 (JBA).**

United States District Court,
D. Connecticut.

March 31, 1998.

Robert W. Mahoney, Michael R. Heyison, Kristen Allman Denison, Hale & Dorr, Boston, MA, Daniel L. Fitzmaurice, Day, Berry & Howard, Hartford, CT, for Defendant.

## MEMORANDUM OF DECISION

ARTERTON, District Judge.

This diversity case, tried to the bench, requires determination of whether the circumstances surrounding the defendant's termination and non-renewal of the parties' Dealership Agreement was for good cause and done in good faith under the Connecticut Motor Dealer's Act, Conn. Gen.Stat. § 42–133v. The termination, commenced by defendant's Notice issued June 26, 1991 and effective September 30, 1991, was precipitated by plaintiff's relocation of its Subaru franchise to a different location and facility than that specified in the Agreement, specifically to a Chevrolet dealership nearby. Both the Subaru and Chevrolet franchises were owned by Richard Jaffe and his wife. During the pendency of plaintiff's motion for preliminary injunction, the parties agreed to continue their business relationship notwithstanding termination of the franchise agreement. After preliminary injunctive relief was denied on March 17, 1993, the parties ceased further business dealings.

### I. Findings of Fact

The plaintiff Richard Subaru, Inc. ("RSI")was licensed by the Conn. Dept of Motor Vehicles to do business at 1625 Highland Avenue, Cheshire Conn, as a dealership for the sale of new and used Subarus under a Dealership Agreement with defendant Subaru of New England, Inc. ("SNE"), a Massachusetts corporation in the business of distribution of Subaru vehicles, accessories and parts in New England. All such Subaru products are imported to the United States by Subaru of America, Inc. ("SOA"), which is not a party in this case. Richard E. Jaffe is plaintiff's president and owner of 51% of its stock. He was also the owner of Richard Chevrolet, Inc. Located at 1405 Highland Avenue, one half mile from RSI. Ernest J. Boch was defendant's principal owner and chief executive officer. Henry J. Burbank

Jeffrey A. Fillman, Lakeville, CT, for Plaintiff.

was SNE's vice president for market development.

Plaintiff's facility at 1625 Highland Avenue was acquired in 1988 by Jaffe from Genest Subaru with whose operations both Burbank and Jaffe had prior familiarity. SNE played no role in the Jaffe–Genest negotiations, which resulted in a five-year lease with purchase option and a "blue sky" agreement whereby Jaffe paid $531,500 for Genest goodwill and non-competition. These terms, while satisfactory to Jaffe at the time of transaction, became financially onerous in the context of subsequent Japanese import market contraction, economic recession and diminished profitability in RSI operations. While the Genest dealership had done well at its zenith, it had apparently more recently suffered from mismanagement. Knowing this, but confident his successful dealership experience with Richard Chevrolet and knowledge of the town and its citizenry would enable him to turn it around to profitability, Jaffe completed the Genest transactions in connection with his Dealership Agreement with SNE. ·

The dealership agreement between RSI and SNE, a requirement for becoming a Subaru dealer was primarily negotiated by Jaffe and Burbank. While the trial evidence was disputed as to how much emphasis had been given to SNE's requirement of exclusive facilities during these negotiations, it was clear that SNE's requirement and underlying rationale was discussed. Moreover, the "Facilities" portion of the Agreement dated October 5, 1988 referenced RSI's obligation to provide and use exclusively for Subaru dealership operations the specified facilities at 1625 Highland Avenue. This exclusivity requirement was reiterated in Addendum I of the Agreement, which provided that "DEALER . . . agrees to provide said facilities in accordance with said minimum requirements exclusively for its Subaru dealership operation throughout the term of this Agreement."

At trial the testimony of Boch and Burbank recited their historical experience with profit performance of "dual" dealerships versus exclusive dealerships, and they were of the unequivocal opinion that as a general matter and on average, exclusive dealerships outperformed dual dealerships, and accordingly had instituted the requirement of exclusivity as a condition of dealership whenever possible. While there was no real dispute that Boch's fierce devotion to exclusive dealerships was genuine, plaintiff challenged this mind-set as precluding any individualized consideration of RSI's circumstances when in 1990 and 1991 Jaffe sought permission to move his Subaru operation from its approved facility to his Richard Chevrolet facility. In fact, Boch acknowledged that there was no set of circumstances that a dealer could show him that would persuade him to consent to placing a Subaru dealership in a facility shared with another line of cars, i.e., a dual dealership.

While there was extensive data adduced by both parties that demonstrated the positive performance of both exclusive and dual dealership, and there were concomitant challenges to each party's methodologies for analyzing the data, the Court concludes that SNE was not lacking in an objective basis for its business philosophy that exclusive dealerships outperformed duals in New England. Moreover, Jaffe understood and agreed to the facility exclusivity requirement at the time he entered into the three-year Agreement. From the testimony relative to the parties' negotiations, it appeared that Jaffe never questioned this requirement but neither did its potential future significance occur to him at that time, since he anticipated success and profitability in his exclusive Subaru dealership.

However, RSI did not maintain its initial profitability, and by 1990 Jaffe concluded that he could realize operational economies by combining his Subaru and Chevrolet dealerships and thus stem the financial losses that he was experiencing as a result of lowered profitability and his heavy financial obligations to Genest. He and Boch met on two occasions, in late 1989 and early 1990, to discuss Jaffe's discontent with his franchise arrangements. At the second such meeting, Jaffe asked to dual with his Chevrolet dealership. Boch, consistent with his espoused philosophy, was unreceptive, reiterated the reasons for the exclusivity condition, gave

recognition to the tough economic times that his dealerships were experiencing, and emphasized that dualing, in his view, was not the solution. At Jaffe's request, he came to the Cheshire facility, toured both of Jaffe's dealerships, and gave Jaffe his conclusion that the requested dual dealership was unacceptable, particularly since it appeared to Boch that Chevrolet would dominate the facility. In response, Jaffe proposed building a separate, freestanding facility on the Chevrolet lot, conditioned on being permitted to dual for a period of time (during which time Jaffe hoped to demonstrate the profitability of a dual dealership and thereby eliminate the need for new construction). SNE approved the relocation request to a separate exclusive facility but rejected any interim dualing. SNE's rationale for rejecting any interim dualing was that its position with its other dealers would be thereby compromised. Boch made several recommendations to Jaffe on ways to make his franchise more profitable where it was currently located. By way of follow-up to the meeting, Burbank confirmed by letter to Jaffe that his relocation was not approved and that any attempt to relocate would constitute breach of agreement. Jaffe made no response to this letter and did not offer rebuttal to Burbank's statistical analysis of weaknesses in the RSI operation; nor did he take any action toward building on the Chevrolet site.

However, in early 1991 Jaffe sought and obtained, without SNE's knowledge, Chevrolet's permission to dual with Subaru, and sought the assistance of SOA with SNE. As a result of contact from SOA, Boch again visited Jaffe in Cheshire. While he still withheld permission for Jaffe to relocate, Boch recommended hiring a new exclusive Subaru sales manager, offered to write and place the position advertisement, offered to assist in interviewing and offered to pay one-half of the salary for three months. Jaffe gave some acknowledgment to the benefit of a new sales manager, but took no further action on Boch's proposal.

In early April 1991, Genest contacted Burbank informing him that Jaffe planned to relocate, but when Burbank in turn queried

Jaffe on this information, Jaffe explained that he had just been trying to negotiate a lower rent with Genest. Again, Burbank recalled to Jaffe the oft-repeated admonition that exclusivity was central to the dealership agreement and that relocation without permission would put him in breach. Shortly thereafter, Jaffe requested SNE assistance in relocating a RSI dealer network computer to 1405 Highland Avenue to consolidate the two dealership office functions. Burbank agreed to assist with this transfer if Jaffe would confirm to him his continuing compliance with his Agreement's facility commitments, which Jaffe did not confirm.

On April 13 or 14,1991, Jaffe began relocation of his Subaru dealership to the Chevrolet facility, advising SNE by letter dated April 12, 1991 of his "immediate" relocation. Not surprisingly, SNE gave Jaffe written notice on April 19, 1991 that his relocation without prior approval constituted breach of his Dealership Agreement, appeared to violate Connecticut law on relocation of motor vehicle dealers,[1] and demanded immediate response from Jaffe on RSI's intent to cure. The two discussed resolutions, with Burbank suggesting consideration of the separate building proposal and Jaffe countering with a "look alike" proposal, which included doubling the Chevrolet showroom size and dividing the lot for signage purposes. Burbank rejected the "look alike" dealership as unfair to SNE's other dealers who were honoring their exclusivity commitments. RSI was given until May 3, 1991 to cure and comply with the facility requirements of the Agreement. The last substantive negotiation toward resolution was in early May 1991 and involved discussion of dualing while constructing a separate on-site facility. While the precise content of these discussions is disputed, the reasonable inference is that SNE would permit dualing during simultaneous construction, a condition that did not satisfy Jaffe's understandable reluctance to invest any more money at a time he was feeling the financial pressures that precipitated his unauthorized relocation in the first place. The upshot was that the two parties staked out their legal positions—RSI asserting that SNE had un-

---

1. *See* Conn. Gen.Stat. § 42–133dd(a).

reasonably withheld consent to relocation; SNE maintaining that the unauthorized relocation was a breach of the Agreement to remain at the 1625 Highland Avenue facility for the three year term of the Agreement.

On June 26, 1991, SNE issued its Notice of Termination (Def.'s Ex. 23) formally setting forth its intention to terminate, cancel and not renew RSI's Dealership Agreement effective September 30, 1991, specifically claiming breach of the Agreement from plaintiff's "unilaterally and without prior approval act[ing] to relocate Subaru dealership operations from your authorized facilities located at 1625 Highland Avenue in Cheshire, CT to an unauthorized site located at 1405 Highland Avenue, approximately five miles to the south."

Defendant identified plaintiff's conduct as violating:

> its commitment to provide the Genest facility specified in the Dealership Agreement for the entire term of the agreement (Agreement ¶ 9; Addendum I, ¶ 2);

> its obligation to obtain the prior written approval from SNE( and SOA) before relocation (Agreement ¶ 14; Standard Provisions § 5.3); and

> its obligation to refrain from unlawful conduct because it had relocated without notice having issued to the DMV and to other motor vehicle dealers as required under Conn.Gen.Stat. § 42–133 dd (Standard Provision § 4.1).

From all the evidence, the Court concludes that Jaffe was being significantly less than candid with SNE after it was clear that SNE would not give approval to his request. In addition to soliciting Chevrolet's approval and SOA's assistance without SNE's knowledge, and making relocation arrangements while simultaneously denying such intent, Jaffe also executed a renewed Subaru dealership agreement reflecting the Genest 1625 Highland Avenue dealership location and the same exclusivity obligations, but purported to qualify this renewal by reference to his April 12 relocation letter. The Court has no basis for finding that these exchanges constituted any sort of *bona fide* renewal negotiations, and concludes that the non-renewal claim

should be determined on the same evidentiary basis as the termination.

Thereafter and until March 17, 1993 when plaintiff's Motion for Preliminary Injunction to enjoin the franchise termination was denied, RSI and Richard Subaru operated out of the same facility. Because proof of whether SNE complied with Conn. Gen.Stat. § 42–133v's requirements of good cause and good faith is assessed at the time SNE's decision became final (September 30, 1991), the Court excluded any evidence of RSI's subsequent success as a dual dealer as irrelevant. Further, defendant's evidence was controverted and inconclusive as to whether Chevrolet Geo products, also Japanese imports, actually were competitive with the Subaru as SNE claimed.

Based on the testimony of the affable but adamant Ernest Boch, which demonstrated that his total dedication to the exclusivity policy that he had employed to great success over many years, coupled with his clearly articulated unwillingness to permit precedent for any of his dealers' departure from these obligations, the Court concludes that his individualized examination of RSI's request for relocation approval, was largely *pro forma* and primarily directed at dissuasion. However, he and Burbank did give individualized attention to Jaffe's complaints by troubleshooting reasons for RSI's diminished profitability. Burbank undertook statistical analyses; Boch offered to subsidize personnel upgrades; and both offered the staff resources of SNE for consultation and assistance. Notwithstanding the Court's conclusion that they adopted this approach of focusing on improvements at the Genest facility first, with a mind set that had foreclosed Jaffe's request to dual, they had not foreclosed a relocation which embodied the attributes of exclusivity. The Courts finds very significant that Jaffe never attempted any of the SNE recommended improvements or proposals, and thus Boch's faith in well-managed exclusive dealerships, even as applied to RSI and its circumstances, was shown by SNE to have been reasonable and based on legitimate business factors.

Thus, the Court concludes that this trial record is inadequate to conclude that

SNE's response to the relocation request was an unfounded adherence to an outmod-ed dealership management policy instead of a reasonable insistence on "exhaustion" of management tightening techniques. More significantly, Jaffe's self-help solution to his financial dilemma, absent a demonstrated prior but unavailing compliance with SNE's recommendations, was a clear breach of the terms and conditions of both exclusivity as well as location of the dealership facility. While Jaffe knew he was faced with SNE obstinacy, and he was feeling acute financial pressures, the Court concludes that his actions were premature and violated an agreement whose terms were not on their face unreasonable. Moreover, the financial condition of RSI portrayed to SNE was not one of such financial *extremis* as to show SNE that RSI was in imminent danger of bankruptcy or other dire imminent and irreversible consequences.

While it is understandable that a businessperson would choose to take action to stop financial hemorrhaging, Jaffe's distress was caused by financial strictures that deprived him of the ability to pay himself and his wife a salary for their work managing RSI, which he estimated to be worth at least $100,000 per year and which had gone unpaid for two years. However, it is beyond dispute that Jaffe knew of his obligations, knew that SNE would not deviate from its exclusivity policy for the duration of his Agreement, and that he took a roll of the legal dice with his secretive move. For the reasons that follow, however, Mr. Jaffe's actions landed snake-eyes.

## II. *Conclusions of Law*

 To prevail, SNE must demonstrate by the preponderance of the evidence that it "has good cause for cancellation, termination or non-renewal and has acted in good faith" notwithstanding the terms of the parties' Agreement. Conn. Gen.Stat. § 42–133v(a). The statute defines "good cause" as "a failure by the dealer to comply with a provision of the franchise which is both reasonable and of material significance to the franchise relationship..." Conn. Gen.Stat. § 42–133v(b)(1), and "good faith" as "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." Conn. Gen.Stat. § 42–133r(11). Two of the reasons given by SNE in its Notice of Termination were plaintiff's failure to provide the Genest Facility at 1625 Highland Avenue for its Subaru Dealership for the entire three years of the Agreement and plaintiff's failure to obtain SNE's written consent before it relocated to the 1405 Highland Avenue location of Richard Chevrolet. The maintenance of the Subaru dealership in an approved location and in an approved facility were certainly provisions of the agreement that were of material significance to the franchise relationship, given the multiplicity of purposes to be separately and effectively served (new vehicle sales and showroom, parts facility, service facility, storage facility, used car sales facility and general office facility) as well as the esthetic, convenience and efficiency factors of importance to customer satisfaction. The term that these facilities are to be provided and used exclusively for Dealer's Subaru operations (Def.'s Ex.1) is repeated in the Agreement and Addendum I, and is clearly made applicable to every facility with Subaru operations. The Agreement represents a supplemental term in this regard in addition to SOA's Standard Provisions.

Based on the documents and the testimony at trial, which at a minimum reflected that the subject of exclusivity was addressed during negotiations, it is evident that this "exclusivity" term added by SNE was of material significance to the franchise relationship, since it was obvious that SNE would not have agreed to the dealership with plaintiff absent agreement on exclusivity. While it is true that the Addendum identifies sales performance as "a material and significant element of the franchise relationship" and makes no similar identification for facility exclusivity, this does not preclude a finding of the requisite materiality, particularly since the statute does not limit analysis to the language of the franchise agreement itself.

Given the uncontroverted evidence of RSI's relocation before expiration of the three year term, it will be deemed a breach if the term was a reasonable one. The testimony of Boch and Burbank as to their com-

parative experiences with exclusive and dual dealerships, resulting in their single-minded devotion to the former, set forth the factors that they found accounted for the success of their exclusive dealerships. Certainly SNE's significant rise in national rankings of Subaru distributorships attests to the commercial viability of this term. Although plaintiff's evidence of the success of dual dealerships, both in and outside of Connecticut, indicates that there is room for reasoned debate on this issue, SNE had predicated its long-term marketing approach on the exclusive approach and "on average" its statistics corroborated its marketing theory.

Thus, even though exclusivity was not the only way to successfully conduct this business, the Court concludes that it was rationally related to maintenance of a successful franchise and that SNE was not being arbitrary and commercially unreasonable in its insistence on this term when the parties entered into their agreement. Thus, it was the intent of the parties to provide an exclusive Subaru facility at Genest to operate the dealership, and RSI's breach of this term constitutes good cause for SNE to terminate the dealership agreement. Since the termination was effected by refusing to renew it upon its September 30, 1991 expiration, the Court does not differentiate between the evidence supporting termination and non-renewal for the purposes of this case, which appears consistent with RSI's Supplemental Complaint.

The next question then is whether SNE acted in good faith in withholding its consent to RSI's relocation proposal under the circumstances. While the statutory definition of "observance of reasonable commercial standards of fair dealing in the trade" is general, the Court finds instructive the judicial gloss from the Connecticut Franchise Act articulated by the Second Circuit in *Petereit v. S.B. Thomas, Inc.*, 63 F.3d 1169 (2d Cir.1995), that the unequal economic bargaining positions of franchisor and franchisee underlies these statutes and thus prevention of the raw exercise of this power is to be scrutinized closely. It is recognized that a franchisee need not be driven to the brink of economic ruin before statutory protections apply, as such harshness would not fall within the meaning of "fair dealing" in the trade. SNE's response of reviewing alternatives to relieve RSI's economic woes lends factual support to this conclusion. Moreover, as SNE acknowledged to the DMV was required of it, reasonable commercial standards implicate individualized examination of a franchisor's policy *as applied.* Thus, a facilities condition that was reasonable at the time a franchise agreement was executed does not means that a franchisor's continued insistence on its observance is per se reasonable. Here, SNE took the troubling position that there probably were no circumstances under which it would permit RSI to relocate to dual with Richard Chevrolet. However, it continued to negotiate with RSI, and showed movement in its negotiations, including conditions under which it would permit relocation to the Chevrolet site, and even a dual use of the facility while RSI constructed a separate on-site facility. What Jaffe wanted, however, was a dual trial period affording him the opportunity to show SNE that he could be more profitable than at the Genest facility, *before* he undertook the additional financial obligation of the new facility, and hopefully obviating the need for it.

Notwithstanding SNE's viewpoint that exclusive dealerships had been the key to its success and dueling was thus anathema, SNE was willing to work toward solutions that were not antithetical to its philosophy—subsidized new sales manager, consultation and assistance to tighten other operational aspects, joint site use—and the parties had not reached the point where RSI had exhausted SNE's solutions and could show that the construction cost of a new facility was an absurd solution to the economic pressure faced by RSI. The financial picture presented by RSI in fact did not show that the dealership operation itself was in such substantially bad shape, although from the Jaffe's standpoint their personal financial undertakings to Genest and RSI's capitalization could not be segregated from RSI's profile, particularly since it had not yet provided them with any salary to offset their indebtedness.

Thus, where SNE's unwavering adherence to its policy of exclusivity had the potential

for being characterized as arbitrary and unreasonable if applied without regard to a franchisee's individual circumstance, such was not yet the case here. SNE had a further concern that if it made an exception for RSI it would be opening the door to such requests from its other exclusive dealers. While concern for precedent is not necessarily demonstrative of good faith under all circumstances, here the interchange between RSI and SNE had not played out except to the extent that SNE refused relocation to dual and that was all RSI would accept. *See, e.g., Brattleboro Auto Sales, Inc. v. Subaru of New England,* 633 F.2d 649, 652 (2d Cir. 1980). "Moreover, in the automobile industry, as in other business endeavors, it is both a legitimate and a necessary course of conduct to take action relative to one's probable future business results as affected by present occurrences."

Under the circumstances, the Court concludes that absent plaintiff's exhaustion of other alternatives, SNE was not unreasonable in believing that RSI's dualing would be injurious to its interest in maintaining its track record of success by maintaining its dealerships as exclusives wherever possible. This is not to say that SNE's decision was infallibly correct in every instance—and the evidence at trial would suggest to the contrary, even within its Connecticut dealerships, but it was reasoned, was supported by extensive history and with considerable marketplace success.

### Conclusion

 Accordingly the Court concludes that SNE has met its burden of proving that RSI's unauthorized relocation was good cause for termination and non-renewal of this franchise agreement and that SNE acted in good faith in so doing. Having reached this conclusion, it is unnecessary to reach the question whether SNE has made a similar proof showing with respect to its claim that RSI breached its obligation to refrain from unlawful conduct because it relocated without notice issuing to the DMV and other dealers as required under Connecticut law. On

plaintiff's remaining claims as to which it bears the burden of proof, the Court does not find that the refusal to permit dualing with the Chevrolet dealership constitutes a violation of Conn. Gen.Stat. § 42–133bb(6), which prohibits a distributor from requiring a dealer to refrain from the "participation in the management of, investment in, or acquisition of any other line of new motor vehicles or related products," since this prohibition does not apply unless "the dealer remains in compliance with any reasonable facilities requirements of the … distributor…," and the Court has concluded that under all the circumstances presented, SNE's exclusive facilities requirement remained a reasonable one. Similarly, there was no evidence implicating abridgement of RSI's right of free association with other dealers, protected under Conn. Gen.Stat. § 42–133cc(7),[2] a statutory protection for collective actions by dealers vis-a-vis the mightier distributors or manufacturers. Absent any indication of legislative intent that this prohibition was intended to outlaw exclusive franchise agreements, plaintiff's claims of its violation under these circumstances lacks merit. Inasmuch as plaintiff's claims under the Connecticut Unfair Trade Practices Act, § 42–1106 *et seq.* (Count Four), are predicated on proof of defendant's violation of the Dealer's Act, it too must fail.

Accordingly, judgment may enter in favor of SNE on the Supplemental Complaint. SNE's counterclaim for declaratory relief is GRANTED on Counts One and Two, in accordance with the foregoing findings. As to Counts Three and Four, claiming that plaintiff's actions and conduct were willful and intentional violations of the terms of the Agreement and the provisions of Conn. Gen. Stat. § 42–133dd so as to constitute bad faith and unfair acts and practices under the Connecticut Unfair Trade Practices Act, § 42–110b *et seq.*, SNE has failed to demonstrate the requisite dishonest purpose, fraud or sinister motive. *See, Habetz v. Condon,* 224 Conn. 231, 237, 618 A.2d 501 (1992). While plaintiff's conduct, driven by an increasing sense of desperation and frustration, prema-

---

**2.** Conn. Gen.Stat. § 42–133cc(7): "No …distributor shall: … [d]eny any dealer the right of free association with any other dealer for any lawful purpose."

turely and precipitously acted in poor judgment or out of a misconception of what his rights were and what SNE's obligations were at the time he acted, this evidence falls short of proof that plaintiff was motivated by fraudulent intent, design to mislead, or sinister motivation.

Accordingly, the Court concludes that judgment may enter in RSI's favor on Counts Three and Four of the Counterclaim.

IT IS SO ORDERED.