**ESPN, INC., Plaintiff,**

v.

**OFFICE OF THE COMMISSIONER OF BASEBALL, Defendant.**

**No. 99 CIV 3225(SAS).**

United States District Court, S.D. New York.

Nov. 23, 1999.

Eric J. Lobenfeld, Robert A. Schwinger, Jonathan M. Sobel, Chadbourne & Parke LLP, New York, NY, for Plaintiff ESPN.

Robert J. Kheel, Willkie Farr & Gallagher, New York, NY, Robert A. DuPuy, Foley & Lardner, Milwaukee, WI, for Defendant Baseball.

### OPINION AND ORDER

SCHEINDLIN, District Judge.

### Introduction

This is a contract dispute between ESPN, Inc. ("ESPN"), an all-sports cable television network, and The Office of Major League Baseball ("Baseball"), which acts on behalf of the Major League Baseball clubs. In 1996, the parties entered into a telecasting agreement (the "1996 Agreement") pursuant to which Baseball granted ESPN the right to telecast regular season major league baseball games on its primary cable service. In exchange, ESPN agreed, among other things, to pay Baseball yearly rights fees and to produce baseball game telecasts on Wednesday and Sunday nights during the regular season.

### A. Background [1]

The 1996 Agreement includes two provisions that are the primary focus of this litigation. The first is a representation by ESPN that "it has not made nor will it make any contractual or other commitments that conflict with or will prevent full performance [of the 1996 Agreement]." 1996 Agreement, Ex. O to 10/15/99 Affidavit of Robert J. Kheel, attorney for Baseball ("Kheel Aff."), at 60. The second provision permits ESPN to preempt up to ten baseball games a season with Baseball's prior written approval, which may not be unreasonably withheld. The preemption provision states:

> With the prior written approval of Baseball, which shall not be unreasonably withheld or delayed, ESPN may ... preempt any [Baseball game telecast] hereunder, up to a maximum of ten [Baseball game telecasts] per year, for an event of significant viewer interest.

*Id.* at 48–49. Pursuant to this provision, Baseball may telecast the preempted baseball games on its secondary cable service, ESPN2. *Id.* at 49 & 1997 Amendment.

On January 13, 1998, ESPN entered into a telecasting contract with the National Football League ("NFL") whereby ESPN

1. The background facts are taken from the parties' Joint Pretrial Order ("JPTO"), which was submitted on October 25, 1999. In each instance, page citations to both ESPN's contentions and Baseball's contentions are provided.

obtained the rights to broadcast regular season NFL games on Sunday nights. *See* JPTO at 23, 38. On January 30, 1998, ESPN requested Baseball's approval to telecast NFL games in place of baseball games on three Sunday nights in September 1998. *See id.* at 23, 43. Baseball declined to approve ESPN's request. *See id.* at 23, 44. Despite Baseball's disapproval, however, ESPN substituted NFL games for baseball games on the three Sunday nights in question. *See id.* at 25, 45. Baseball refused to allow ESPN to broadcast the preempted baseball games on ESPN2. *See id.* at 25, 41–42.

This exact series of events repeated itself in January 1999, when ESPN again sought Baseball's approval to replace three baseball games scheduled for Sunday nights in September 1999 with football games. *See id.* at 25, 45. Baseball denied ESPN's preemption request; ESPN preempted the three September 1999 baseball games in favor of football games; and Baseball refused to allow ESPN to broadcast the preempted games on ESPN2. *See id.* at 26–27; 45.

### B. Contentions of the Parties

In April 1999, Baseball terminated the 1996 Agreement contending that ESPN had materially breached the contract. In response, ESPN commenced the instant litigation in which it alleges that Baseball materially breached the contract by (i) unreasonably withholding its approval of ESPN's preemption requests in 1998 and 1999; (ii) precluding ESPN from broadcasting the preempted baseball games on ESPN2; and (iii) improperly terminating the parties' agreement. *See id.* at 3. ESPN seeks damages and declaratory and injunctive relief. *See id.*

Baseball has asserted counterclaims against ESPN in which it alleges that ESPN materially breached the 1996 Agreement by (i) entering into a "conflicting" contract with the NFL; (ii) preempting Baseball games in 1998 and 1999 without ESPN's prior written approval; and

(iii) utilizing highlight footage of baseball games in excess of the amount authorized by the 1996 Agreement. *See id.* at 4. Baseball also seeks damages and declaratory and injunctive relief. *See id.*

### C. Motions in Limine

On October 15, 1999, the parties moved in limine to preclude the admission of certain evidence and argument at their forthcoming trial. Ten separate motions—five by Baseball and five by ESPN—were fully submitted on October 29, 1999. The following constitutes the Court's ruling on six of the ten motions in limine. The remaining four motions will be the subject of separate orders or rulings from the bench.

### *Motions in Limine*

### I. Baseball's Motion Pursuant to Fed. R.Civ.P. 12(f) and 56 to Strike the Affirmative Defense of Election of Remedies or in the Alternative for Summary Judgment

In its Amendment Answer to Baseball's counterclaim, ESPN asserts the affirmative defense of "election of remedies". By this motion, Baseball seeks to preclude ESPN from asserting such a defense.

### A. Election of Remedies

 The doctrine of "election of remedies" provides as follows:

> When a party materially breaches a contract, the non-breaching party must choose between two remedies—[it] can elect to terminate the contract and recover liquidated damages or [it] can continue the contract and recover damages solely for the breach. A party can indicate that [it] has chosen to continue the contract by continuing to perform under the contract or by accepting the performance of the breaching party. Once a party elects to continue the contract, [it] can never thereafter elect to terminate the contract based on that breach, although [it] retains the option of termi-

nating the contract based on other, subsequent breaches.

*Bigda v. Fischbach Corp.*, 898 F.Supp. 1004, 1011–12 (S.D.N.Y.1995) (citations omitted). *See also Apex Pool Equip. Corp. v. Lee*, 419 F.2d 556, 561–63 (2d Cir.1969) (Under New York law, " '[w]here a contract is broken in the course of performance, the injured party has a choice ... of continuing the contract or of refusing to go on'.... If the injured party chooses to go on [it] loses [its] right to terminate the contract because of the default.") (quoting *Emigrant Indus. Sav. Bank v. Willow Builders*, 290 N.Y. 133, 145, 48 N.E.2d 293 (1943)); *Inter–Power of New York, Inc. v. Niagara Mohawk Power Corp.*, 259 A.D.2d 932, 686 N.Y.S.2d 911, 913 (3d Dep't 1999) (Although a party can either "treat the entire contract as broken and sue immediately for the breach or reject the proposed breach and continue to treat the contract as valid", the party must "make an election and cannot 'at the same time treat the contract as broken and subsisting. One course of action excludes the other.' ").

ESPN contends that because Baseball accepted full performance by ESPN for the 1998 and 1999 seasons, it elected to continue the 1996 Agreement and therefore cannot seek termination of the contract based on any alleged breaches by ESPN during those years. According to ESPN, Baseball can only seek damages for ESPN's alleged breaches of the 1996 Agreement.

### B. Ability to Terminate for Alleged 1998 Breaches

To the extent Baseball seeks termination based solely on ESPN's 1998 contract with the NFL or its preemption of three baseball games in 1998—assuming that those acts constitute material breaches of the 1996 Agreement—the election of remedies defense bars such relief. That is, with respect to both of the alleged 1998 breaches, Baseball continued to perform and continued to accept performance under the 1996 Agreement for more than a year, and thus it lost its right to terminate for those breaches. *See Inter–Power of New York, Inc.*, 686 N.Y.S.2d at 913 (A party must "make an election and cannot 'at the same time treat the contract as broken and subsisting. One course of action excludes the other.' "); *see also Lazard Freres & Co. v. Crown Sterling Management, Inc.*, 901 F.Supp. 133, 136 (S.D.N.Y.1995) (same); *V.S. Int'l, S.A. v. Boyden World Corp.*, 862 F.Supp. 1188, 1196 (S.D.N.Y.1994) (same).

Baseball concedes that it "continued performance of the 1996 Agreement after ESPN's 1998 breach" but claims that its ability to terminate the agreement based on those breaches is preserved by the contract's broadly worded "no waiver" provision. BB MIL at 5.[2] Essentially, Baseball argues that a contractual "no waiver" provision trumps the common law contract principle of election of remedies. Although Baseball's contention is legally without merit, it raises interesting and seldom addressed issues regarding the relationship between the doctrines of waiver and election and thus merits a more detailed analysis.[3]

### 1. Waiver Versus Election of Remedies

■ The doctrines of waiver and election of remedies are complementary rather

---

**2.** The briefs for each motion in limine are cited as follows: "(name of moving party) MIL at __"; "(name of opposing party) Op. at __"; "(name of moving party) Rep." Baseball is referred to as "BB" for citation purposes.

**3.** Baseball also argues that ESPN must demonstrate that it "changed its position to its detriment in reliance on [Baseball's] indication that [it] elected to treat the contract as valid" in order to establish an election of remedies defense. BB MIL at 4. However, the Second Circuit has clearly held that detrimental reliance is not an essential element of an election of remedies defense. *See Apex*, 419 F.2d at 562 ("Nor is it necessary to the binding character of such an election that the other party rely thereon to [its] detriment. It is enough to show that the electing party has continued to accept benefits under the contract.").

than competing common law contract principles. Under the doctrine of waiver, "a party may, by words or conduct, waive a provision in a contract or eliminate a condition in a contract which was inserted for [its] benefit." *Oleg Cassini, Inc. v. Couture Coordinates, Inc.*, 297 F.Supp. 821, 830 (S.D.N.Y.1969); *see also* Farnsworth, Contracts § 8.18 (3d ed.1999). Suppose, for example, that under the 1996 Agreement ESPN is obligated to make bi-weekly payments of $100,000 to Baseball. Suppose further that after several months of making the required bi-weekly payments, ESPN begins to tender monthly payments of $100,000 to Baseball. If Baseball accepts and/or fails to object to ESPN's deficient payments, then Baseball has eliminated or "waived" its contractual right to bi-weekly payments of $100,000 under the 1996 Agreement.[4]

■ In contrast to a waiver of contractual rights, an election is simply a choice among remedies by the party; it is a decision by that party as to how it should proceed in the wake of the breaching party's nonperformance. In other words, "an election is not a waiver of any rights under the contract but rather a choice between two inconsistent remedies for breach of the contract." *Bigda*, 898 F.Supp. at 1014.

Returning to the hypothetical, suppose that Baseball had, in fact, objected when ESPN began to tender monthly rather than bi-weekly payments. Under these facts, Baseball has preserved its contractual right to bi-weekly payments of $100,000, and thus there is no waiver of that provision. However, Baseball must still decide how to proceed in light of ESPN's hypothetical nonperformance. Assuming that ESPN's hypothetical failure to make time-ly and sufficient payment is a material breach, Baseball has two choices. It can terminate the parties' contract and claim damages for total breach. Or, it can continue the contract and sue for partial breach. The election of remedies simply requires that Baseball choose or "elect" a single course of action. Thus, if Baseball terminates the contract, then it has elected termination, and it cannot continue to perform or expect performance under the contract. If Baseball chooses to continue the contract, then it has elected to continue, and it cannot later decide to terminate based on the same breach. In essence, the election of remedies doctrine is implicated only in the absence of waiver. That is, if a party waives her right to performance under a contract, then she has no remedies to elect because she has waived her ability to enforce the relevant provision. If a party has not waived her right to enforce a provision in the event of breach, then she can elect the appropriate and desired remedy. The key is that once a party has elected a remedy for a particular breach, her choice is binding with respect to that breach.

### 2. "No–Waiver", Provision

■ A "no-waiver" provision is simply an explicit agreement between the parties that a certain act or, more commonly, the failure to act does not constitute a waiver of rights under the agreement. For example, the no-waiver provision included in the 1996 Agreement protects the parties from inadvertently waiving their rights by requiring that any waiver be made in writing. The clause explicitly states that a party's failure to object to nonperformance is not a waiver of the right to that perfor-

---

4. Note that a party's waiver of a contract provision is not absolute. That is, a previously waived provision may be restored " 'by a reasonable notice demanding performance and stating that the contract will be rescinded if the notice is not complied with.' " *Oleg Cassini*, 297 F.Supp. at 831 (quoting *Taylor v. Goelet*, 208 N.Y. 253, 258, 101 N.E. 867 (1913)). In *Oleg*, the court found that

[b]y failing to object to the non-payment of royalties over a period of four months, plaintiff waived its right to performance within the stipulated time. Plaintiff could not thereafter put defendant in default without first demanding performance by defendant, thereby restoring time as an element of the contract.

*Id.*

mance. The 1996 Agreement provides as follows:

H. *No Waiver of Rights*

The failure of either party to seek redress for any violation of, or to insist upon the strict performance of, any term of this Agreement shall not constitute a waiver of such rights or in any way limit or prevent the subsequent enforcement of any such term. All waivers must be made in writing. Any waiver of a right or remedy pertaining to this Agreement shall not be deemed to be a waiver of any other right or remedy. The various rights and remedies of either party contained herein shall not be considered exclusive of, but shall be considered cumulative to, any rights or remedies now or hereafter existing at law, in equity or by statute or regulation.

1996 Agreement, Ex. O to Kheel Aff., at 69. It is Baseball's position that this clause preserves its ability to terminate the contract regardless of when in time the terminating breach occurred and regardless of whether Baseball initially decided to continue the contract despite the breach, such as it did in response to ESPN's alleged 1998 breaches. Baseball is wrong.

As set forth above, waiver and election are distinct principles that do not overlap but rather control different phases of the contractual relationship. Waiver governs both the parties' bargained-for rights to performance and their rights to seek certain remedies for non-performance; it determines whether something has occurred—an action or inaction—to alter or eliminate a term of the parties' agreement or an available remedy. Election applies in the absence of waiver when one party has, in fact, breached the agreement. Election has no effect on the parties' "rights" under the agreement, nor does it in any way limit the party's "right" to

pursue available remedies. Rather it demands that the party exercise its rightful remedies in a consistent and binding manner. The party must either terminate or continue, but not both. Nor may the party choose one avenue and then change its mind.

■ Put simply, an election is not a waiver of rights but an exercise of rights. As a result, I conclude that a standard "no-waiver" provision. does not immunize or excuse parties from the requirements and consequences of election.[5]

Although it appears that only one court in the Second Circuit has squarely addressed the issue of whether a no-waiver provision bars the operation of election of remedies, that court reached the same conclusion, namely that a no-waiver provision has no application to the doctrine of election. In *Bigda v. Fischbach Corp.*, the plaintiff employee argued that a "no-waiver" provision in his employment contract "enabled him to continue to perform while reserving his right to [terminate] at some later date." 849 F.Supp. 895, 901 n. 2 (S.D.N.Y.1994). The court rejected plaintiff's argument finding that "the decision of a non-breaching party to continue to perform is not a 'waiver' of that party's right to terminate the contract, but an election, and so the clause is irrelevant to this dispute." *Id.* Moreover, although *Apex Pool Equip. Corp. v. Lee*, 419 F.2d 556 (2d Cir.1969), did not involve a no-waiver provision, the Court of Appeals' findings in that case would appear to compel the result reached here. *See Apex*, 419 F.2d at 562. The *Apex* court stated:

The right to terminate in the face of a breach is only an option to declare the contract at an end; if the contract is continued, the party doing so has not, strictly speaking, 'waived' his right but

---

**5.** I decline to address whether parties may explicitly contract around the election of remedies doctrine. That is, although a standard no-waiver provision such as the one at issue here is irrelevant to election, parties could conceivably draft language that purports to avoid the consequences of election. However, because the parties in this case clearly made no attempt to do so, *see supra* at 390, there is no need to reach that issue here.

has executed it in favor of continued contractual relations.... [E]lection in this context does not depend upon an intention to surrender a right; the point is that "[t]he law simply does not, under the circumstances, permit a party to exercise two alternative or inconsistent rights or remedies."

*Id.* (quoting 5 Williston, Contracts § 684 (3d ed.1961)).

Moreover, as a textual matter, the no-waiver provision of the 1996 Agreement does not purport to limit the application of election of remedies. Although the language of the provision is broad and sweeping, it speaks only to issues of waiver. An examination of the no-waiver provision in the context of the hypothetical set forth above illustrates this point.

Assume again that Baseball failed to object in any way when ESPN rendered monthly rather than bi-weekly payments under the parties' hypothetical contract terms. Although Baseball's inaction would normally constitute a waiver of its right to bi-weekly payments, the contractual no-waiver provision protects Baseball from such a result. The provision works as follows:

> The failure of any party to seek redress for any violation of, or to insist upon the strict performance of, any term of this Agreement [i.e., bi-weekly payments] shall not constitute a waiver of such rights [i.e., the right to receive bi-weekly payments; the right to seek redress for failure to make bi-weekly payments; and the right to seek strict performance of bi-weekly payments] or in any way limit or prevent the subsequent enforcement of any such term [i.e., bi-weekly payments].

Thus, Baseball's hypothetical failure "to seek redress ... or to insist upon the strict performance" of ESPN's obligation to tender bi-weekly payments does not waive Baseball's right to receive bi-weekly payments or to seek enforcement of that term. The provision further states: "All waivers must be made in writing. Any waiver of a right or remedy pertaining to this Agreement shall not be deemed to be a waiver of any other right or remedy." These two sentences are nothing more than further protection against inadvertent waiver. They demand that any waiver of a right—such as the right to bi-weekly payment—or a remedy—such as termination or specific performance—be made affirmatively in writing. Moreover a party's written agreement to waive one right or remedy does not in any way affect that party's other rights or remedies under the contract. Accordingly, under the hypothetical, if Baseball agrees in writing to waive ESPN's obligation to make bi-weekly payments, such waiver does not mean that Baseball has waived its additional rights to the telecast of a certain number of Baseball games each year. Similarly, if Baseball agrees in writing to waive its "right" to terminate the contract for a material breach, such waiver does not mean that Baseball has waived its right to seek damages or specific performance.

■ The no-waiver provision sets forth one final protection for the parties: "The various rights and remedies of either party contained herein shall not be considered exclusive of, but shall be considered cumulative to, any rights or remedies now or hereafter existing at law, in equity or by statute." Thus, that a remedy is not explicitly referenced in the contract does not mean it is unavailable to the parties. The remedies in the contract are in addition to all other remedies at law or in equity.[6]

Finally, to read the no-waiver provision as allowing Baseball to now terminate the

---

**6.** With respect to the remedy of termination, under both New York law and the 1996 Agreement a party has the right to terminate only in the event of a material breach by the other party. *See* 1996 Agreement, Ex. O to Kheel Aff., at 62–63 ("Either party may, in its discretion, terminate this Agreement upon ten business days' ... notice in writing and failure to cure during that period by the other party, if the other party materially breaches [this Agreement]").

contract based on breaches that occurred almost two years ago would violate important principles of contract law. As set forth above, "[t]he law simply does not ... permit a party to exercise two alternative or inconsistent rights or remedies." *Apex*, 419 F.2d at 562 (internal quotations omitted). Election enforces this principle by preventing parties to a contract from pursuing two opposing courses of action in the wake of a material breach. A party cannot "elect to continue with the contract, continue to receive benefits from it, and thereafter bring an action for rescission or total breach." *Macfarlane & Assocs., Inc. v. Noxell Corp.*, 93 Civ. 5192, 1994 WL 369324, *4 (S.D.N.Y. July 13, 1994). In addition to the obvious uncertainty and concomitant unfairness that would result from allowing a party to treat its agreement as both "broken and subsisting", there is a more fundamental problem when a party terminates after continuing the contract for a period of time: the party's legal justification for termination has disappeared.

The remedy of termination—or, more accurately, the "right" to terminate—is available only where one party has materially breached the contract. A breach is material if it defeats the object of the parties in making the contract and "deprive[s] the injured party of the benefit that it justifiably expected." Farnsworth, Contracts § 8.16 (3d ed.1999). Where a breach is material, the party is justified in refusing to go on, and thus the law provides that party with the right to terminate. And, a party who terminates in response to a material breach presumably does so because it can no longer derive a worthwhile benefit from its contractual relationship.

■ On the other hand, where a party with the right to terminate chooses instead to continue, the only inference to be drawn is that the party will derive a worthwhile benefit from its contractual relationship. Therefore, the party's election to continue rather than end the contract essentially moots its legal justification for termination. Once a party recognizes contractual benefits in the wake of a material breach, that particular breach can no longer be considered the antithesis of the contract, and it can no longer serve as the basis for termination. Of course, if a party chooses to continue with the contract and the other party subsequently commits another material breach, the party has the right to terminate based on the new breach. This is the scenario to which I now turn.[7]

## C. Termination for Alleged 1999 Breach

Baseball elected to continue the 1996 Agreement despite ESPN's alleged material breaches in 1998. As a result, Baseball can no longer terminate the parties' contract based on those breaches. However, to the extent Baseball seeks termination based upon ESPN's preemption of three baseball games in 1999—assuming arguendo that the 1999 preemptions constitute material breaches of the parties' agreement—the election of remedies doctrine does not bar such relief.

In January 1999, ESPN sought permission to preempt baseball games on three Sunday nights in September 1999. On February 11, Baseball declined to approve the requested preemption. On March 1, ESPN advised Baseball that it would preempt the September games notwith-

---

**7.** For all of the reasons discussed in the preceding section, I reject Baseball's similar argument that the doctrine of election is inapplicable because "in its written correspondence with ESPN on this matter, [Baseball] in addition, reserved specifically all its rights." BB MIL at 6. Regardless of how many times Baseball "reserved its rights" in written correspondence regarding the al-

leged 1998 breaches, Baseball cannot avoid the fact that once it elected to continue the contract, it lost its ability to terminate based on the 1998 breaches. *See* 5 Williston, Contracts § 684 (3d ed.1961) (even if electing party "expressly states that [it] intends to reserve a right, [it] will, nevertheless, lose [that right] if [it] takes an inconsistent course").

standing Baseball's denial of its request. In response, on April 21, 1999, Baseball terminated the parties' agreement effective at the end of the Baseball season in October. Baseball's notice of termination stated: "As outlined above, ESPN has materially breached the [1996] Agreement. Therefore, Baseball hereby terminates the Agreement pursuant to Paragraph XX.B. thereof effective immediately following the last game of the 1999 regular season." *See* 5/21/99 letter from Paul Beeston, President and CEO of Baseball, to various officers of ESPN, Ex. I to 10/24/99 Affidavit of Eric J. Lobenfeld, attorney for ESPN, in Opposition to Baseball's Motion to Strike the Affirmative Defense of Election of Remedies ("Lobenfeld Election Aff.").

It is useful to compare Baseball's actions in connection with the alleged 1998 breaches to its actions in connection with the alleged 1998 breaches. In 1998, Baseball clearly elected to continue its contract with ESPN. Although Baseball informed ESPN that it considered the NFL contract and the 1998 preemptions to be material breaches, *see, e.g.,* 8/18/98 letter from Thomas Ostertag, General Counsel of Baseball, to Edwin M. Durso, Executive Vice President of Administration of ESPN, Ex. F to Lobenfeld Election Aff., and although it "reserved" its right to terminate, *see, e.g., id.,* there is no question that Baseball elected to continue and did continue the agreement throughout 1998 and into the 1999 season. In 1999, however, Baseball did not merely mention or reserve its right to terminate, it in fact terminated the agreement.

Despite Baseball's purported election to terminate in April 1999, ESPN maintains that Baseball cannot seek termination based on the 1999 preemptions

> because even while the parties were litigating their claims and counterclaims about the propriety of termination, in which Baseball was insisting that ESPN's actions threatened not just 1998 or 1999 but all five remaining years on

the contract, the parties both continued performing under the contract for the full remainder of the 1999 season, with Baseball again receiving from ESPN the full 1999 rights fee of $3.4 million and the national cable telecasting of over 80 of its games.

ESPN Op. at 8. According to ESPN, "Baseball plainly made a choice. It elected to continue the contract in the face of the claimed breaches and anticipatory breaches as to five years of the contract that it now cites as the basis for termination, and elected to obtain substantial benefits under the contract from ESPN by so doing." *Id.* In particular, ESPN argues that because Baseball purported to terminate in April 1999 but continued to accept performance under the contract for nearly six more months, it was pursuing two inconsistent courses of action, the very behavior election of remedies disdains.

In response, Baseball asserts that its method of delayed termination was the most reasonable way to sever the parties' contractual relationship. Baseball argues:

> ESPN has cited no cases, nor, we submit, could they, to suggest that Baseball's termination notice was defective because it was not immediately effective at the time the notice was given. Baseball gave ESPN reasonable notice to wind down its relationship with Baseball once Baseball determined that it had no choice but to terminate the 1996 Agreement in view of ESPN's breaches and anticipatory breaches in 1999.

BB Reply at 7. Baseball also states that "the effective date of termination was chosen out of fairness to ESPN and its scheduling arrangements." *Id.* at 6.

■ As Baseball notes, there is little guidance regarding whether a party can give present notice of future termination without running afoul of election of remedies. Again, it is helpful to look at the policy underlying that doctrine. To begin, "the doctrine of election permits parties to wait a 'reasonable time' after learning of

the alleged breaches before terminating the contract. . . . [H]ow much time is reasonable depends on the nature of the performance to be rendered under the contract." *Bigda*, 898 F.Supp. at 1012–13. The critical factor is not the passage of time but "whether the non-breaching party has taken an action (or failed to take an action) that indicated to the breaching party that [it] had made an election." *Id. See also* 5 Williston, Contracts § 684 (3d ed. 1961) ("Election . . . generally need not be exercised until the time arrives when, by the terms of the contract, the party entitled to elect must render some performance. Then either performing or failing to perform will indicate an election.").

■ In the instant case, the issue is not whether Baseball rendered or accepted performance during the time between breach and election but whether Baseball rendered or accepted performance during the time between its election of termination and the effective date of that termination.[8] On the one hand, both Baseball and ESPN tendered and accepted dozens of performances during the six months between April and October 1999. Indeed, ESPN telecast approximately eighty baseball games during the 1999 season. ESPN Op. at 8. However, those individual performances were part of a more global performance. Stated somewhat differently, the 1996 Agreement, in keeping with its subject matter, is seasonal in nature. As a result, it calls for seasonal performance. For example, the baseball games that are ultimately telecast on ESPN are organized and scheduled months in advance. Indeed, under the 1996 Agreement, Baseball must provide ESPN with a regular season schedule of games "no later than August 15th of the calendar year preceding each Baseball season." *See* 1996 Agreement, Ex. O to Kheel Aff. at 5. By the time the baseball season commences each spring, the parties' global performance for that season is already well under way. Games and other programming have been scheduled and those schedules have been published to, and relied upon by, third parties including sponsors, advertisers, the media and the public. Of course, performance continues throughout the summer and fall as baseball games are telecast and payment is made, but it is clearly all part of the same seasonal undertaking.

This difference is critical because it demonstrates that Baseball did not act inconsistently when it terminated effective at the end of the season. Instead, Baseball's method of termination merely mirrored the nature of the 1996 Agreement. At the time Baseball elected to terminate the contract in April 1999, the 1999 season and performance for that season was well underway. Thus, rather than stop the agreement mid-performance at a high cost to both parties and nonparties, Baseball simply notified ESPN that it would render and accept no "new" performance under the contract; it would not go forward with the 2000 season.[9]

8. There is no question that Baseball's April 1999 termination was timely. Pursuant to the doctrine of anticipatory repudiation, Baseball had no duty to "elect its remedies" prior to ESPN's actual breach of the contract in September 1999. Under New York law, where an anticipatory breach has occurred the party may either sue immediately or wait until there has been actual breach:

> When a promisor repudiates a contract, the injured party faces an election of remedies; [it] can treat the repudiation as an anticipatory breach and immediately seek damages for breach of contract, thereby terminating the contractual relation between parties, or [it] can treat the repudiation as an empty threat, wait until the time for performance arrives and exercise [its] remedies for actual breach if a breach does in fact occur at such time.

*Silver Air v. Aeronautic Dev. Corp. Ltd.*, 656 F.Supp. 170, 178 (S.D.N.Y.1987) (internal quotations omitted). Accordingly, Baseball could have waited until ESPN actually preempted the September 1999 baseball games to seek termination of the contract.

9. This is markedly different than Baseball's response to the alleged 1998 breaches. In 1998, Baseball not only completed performance of the 1998 season, but it started and continued performance for the new 1999 season.

Not only do I find that Baseball's approach did not violate the doctrine of election, I also find that it was eminently reasonable under the circumstances. Had Baseball terminated effective immediately, not only would both parties have suffered enormous hardship, an immeasurable number of third parties including sponsors, advertisers and the public would have been affected. In an industry where so much time and energy is expended in advance preparation, it makes little sense to treat the fruits of those efforts as a wholly separate "performance" for purposes of the election of remedies defense. I suspect that if ESPN were not Baseball's adversary in this litigation, it would appreciate rather than complain of Baseball's considerate approach to termination.

Accordingly, I find as a matter of law that if the 1999 preemptions by themselves or in connection with other alleged breaches constitute a material breach, Baseball has a right to terminate the 1996 Agreement.[10]

### D. Procedure

In its opposition, ESPN argues that Baseball's motion in limine is procedurally defective because it addresses legal rather than evidentiary issues. According to ESPN, Baseball should have moved for a ruling on election of remedies at the summary judgment stage, and thus it should be precluded from bringing such a motion now.

Although I agree that Baseball should have raised this issue earlier in the proceedings—and certainly during the parties' conference regarding motions for summary judgment—I decline to deny Baseball's motion on procedural grounds. Indeed, ESPN's objection to Baseball's argument of legal issues in limine is somewhat disingenuous considering that ESPN has itself raised purely legal issues in its evidentiary motions. *See* ESPN's *Motion in Limine to Preclude Evidence as to*

ESPN's Purported Inability to Engage in Self–Help, discussed *infra* at Part II.

### E. Conclusion

As a matter of law, Baseball cannot terminate the 1996 Agreement based on ESPN's 1998 contract with the NFL or its 1998 preemptions of baseball games, regardless of whether those actions constitute material breaches of the 1996 Agreement. However, if the 1999 preemptions constitute a material breach of the parties' agreement then Baseball can terminate the contract.

### II. ESPN's Motion in Limine to Preclude Baseball From Proving or Arguing that ESPN Could Not Engage in Self–Help

### A. Background

Under the 1996 Agreement, ESPN agreed, among other things, to broadcast baseball games on Sunday nights during the regular major league baseball season. Specifically, the contract provides: "ESPN shall produce one [baseball game telecast] on each Sunday night of the regular season period up to but not including the final Sunday . . . ." 1996 Agreement, Ex. O to Kheel Aff., at 4. ESPN is also obligated to produce baseball game telecasts on Wednesday nights during the regular season, and it has the right, but not the obligation, to produce baseball game telecasts on various other days. *See id.* at 2–5.

As a limited exception to ESPN's explicit broadcast obligations, the 1996 Agreement includes a "preemption provision" which permits ESPN, with Baseball's prior written approval, to preempt up to ten baseball game telecasts a season for "events of significant viewer interest." Baseball's approval of ESPN's preemption requests may not be "unreasonably withheld".

---

**10.** Although Baseball cannot seek termination based upon the 1998 NFL contract or the 1998 preemptions, those actions may impact the materiality of the 1999 preemptions.

Pursuant to the preemption provision, ESPN requested Baseball's approval to replace three baseball games scheduled for Sunday nights in September 1998 and three baseball games scheduled for Sunday nights in September 1999 with NFL games. Baseball disapproved ESPN's preemption requests. Despite Baseball's disapproval, however, ESPN substituted NFL games for baseball games on the six Sunday nights in question. Thus, it is undisputed that on six occasions ESPN preempted baseball games on Sunday nights during the regular season without the contractually required "prior written approval of Baseball."

### B. Motion in Limine

It is ESPN's position in this litigation that Baseball's disapproval of its preemption requests in 1998 and 1999 was "unreasonable". Moreover, ESPN intends to argue that if Baseball unreasonably withheld approval of ESPN's preemption requests, ESPN was legally entitled to engage in "self-help" by treating Baseball's refusal as a "nullity" and broadcasting football games rather than baseball games on the six relevant Sunday nights. *See* ESPN MIL; ESPN Reply.[11] In contrast, Baseball contends that ESPN had no right to self-help regardless of the reasonableness of Baseball's decision to withhold its approval for preemption. *See* BB Op. at 4; 7/16/99 Deposition of Thomas Ostertag, General Counsel of Baseball ("Ostertag Dep."), Ex. A to 10/15/99 Affidavit of Eric J. Lobenfeld in Support of ESPN's "Self–Help" Motion in Limine ("Lobenfeld Self–Help Aff."), at 98–99, 100.[12]

By its motion, ESPN seeks to preclude Baseball from introducing testimony or argument to the effect that, even if Baseball unreasonably withheld its approval of

11. ESPN concedes that if Baseball's withholding of preemption approval was reasonable, it had no right to engage in "self-help". *See* ESPN Reply at 6.

12. During deposition discovery, Baseball's General Counsel Thomas Ostertag testified that "ESPN could not engage in self-help",

ESPN's preemption requests, ESPN had no right to engage in self-help. Although ESPN has cast its motion in terms of presentation of evidence and argument to the jury, ESPN raises a purely legal issue that must be resolved by this Court as a matter of law. Accurately phrased, ESPN seeks a ruling that if Baseball unreasonably withheld its approval of ESPN's preemption requests, ESPN had the right to telecast NFL games instead of baseball games and therefore did not breach the 1996 Agreement. However, if Baseball is correct and ESPN had no right to preempt the baseball games in the absence of written permission from Baseball, then, as a matter of law, ESPN breached the 1996 Agreement when it preempted baseball games in 1998 and 1999 without Baseball's approval.

### C. Right to "Self–Help"

#### 1. Landlord–Tenant Law Inapplicable

 ESPN's theory of "self-help" is based entirely on three landlord-tenant cases which it cites for the proposition that

> where a written contract provides that a proposed action by one party requires approval by the other party, but that such approval "shall not be unreasonably withheld", if the approving party unreasonably withholds approval .... the party who sought the approval may engage in "self-help"—it may proceed as if its request had been granted.

BB MIL at 3 (citing *Lexann Realty Co. v. Deitchman*, 83 A.D.2d 540, 441 N.Y.S.2d 472 (1st Dep't 1981); *Kruger v. Page Management Co.*, 105 Misc.2d 14, 432 N.Y.S.2d 295 (N.Y.Sup.1980); *Cedarhurst Park Apts., Inc. v. Milgrim*, 55 Misc.2d 118, 284

and that ESPN was obligated to broadcast baseball games on Sunday nights regardless of whether Baseball unreasonably withheld its consent to ESPN's requests for preemptions. *See* Ostertag Dep., Ex. A to Lobenfeld Self Help Aff., at 98–99, 100.

N.Y.S.2d 330 (N.Y.Dist.Ct.1967)). However, none of these cases nor the proposition they stand for is applicable to the instant dispute which involves a commercial contract rather than a residential lease.

Each of the cases relied upon by ESPN concern a tenant's ability to sublet his or her apartment. Each involved a standard residential lease which provided that the tenant could only sublet his or her apartment with the prior written approval of the landlord and that such approval could not be "unreasonably withheld." All three tenants sought permission to sublet, and all three landlords refused their requests. The court in each case, after determining that the landlord's refusal was unreasonable, went on to find that "where consent is unreasonably withheld ... the landlord is deemed to have granted consent." *Lexann Realty*, 441 N.Y.S.2d at 473. *See also Kruger*, 432 N.Y.S.2d at 302 ("Where a landlord has agreed not to withhold consent unreasonably and violates such an agreement, the Courts have held that the tenant may ignore the restrictive covenant and sublet the premises."); *Cedarhurst Park*, 284 N.Y.S.2d at 331 (finding that where landlord unreasonably withheld consent, the "actions of the tenant ... in subletting the apartment to subtenants ... was legal and permitted under the case law on this subject in [New York]"). However, the courts based their decisions regarding a tenant's ability to sublet despite a landlord's unreasonable refusal not on principles of contract law but on principles of real property law which disfavors "provisions or covenants in a lease restricting assignment or subletting." *See Kruger*, 432 N.Y.S.2d at 300. As the court in *Kruger* explained, restrictions on a tenant's ability to assign or sublet are

> restraints which courts do not favor. They have been construed with the utmost jealousy and very easy modes have always been countenanced for defeating

them. The reason is such are restraints on the free alienation of land and tend to prevent full utilization of the land, which is contrary to the best interests of society.

*Id.* (internal quotations and citations omitted). Moreover, *Lexann* and *Kruger* were decided pursuant to section 226–b of the Real Property Law of New York which specifically addresses a tenant's right to sublet and a landlord's ability to restrict that right.[13]

In light of the unique public policy considerations underlying landlord-tenant law, the holdings of *Lexann*, *Kruger* and *Cedarhurst* are irrelevant here and provide no basis for ESPN's contention that it had a legal right to ignore Baseball's disapproval of its request for preemption and to "proceed as if its request ha[d] been granted." As Baseball argues persuasively in its opposition brief, "[t]his special caselaw disfavoring restrictions on real property has no bearing on commercial cases." *See* BB Op. at 4.

## 2. Commercial Contract Law

In its unsuccessful attempt to craft a "self-help" remedy from landlord-tenant caselaw, ESPN has confused and twisted basic precepts governing commercial contracts. As set forth in the discussion of election of remedies, *see supra* Part II.A., it is black-letter law that when one party to a contract materially breaches, the non-breaching party has two options: it can terminate the agreement and sue for total breach, or it can continue the contract and sue for partial breach. *See ARP Films, Inc. v. Marvel Entertainment Group, Inc.*, 952 F.2d 643 (2d Cir.1991); *Estate of John Lennon v. Leggoons, Inc.*, 95 Civ. 8872, 1997 WL 346733, *1 (S.D.N.Y.1997); *Inter–Power of New York, Inc. v. Niagara Mohawk Power Corp.*, 259 A.D.2d 932, 686 N.Y.S.2d 911, 913 (3d Dep't 1999); Farnsworth, Contracts § 8.19 (3d ed.1999).

---

**13.** *Cedarhurst* was decided in 1967, eight years before the 1975 enactment of section 226–b.

"There is, however, no third option allowing the party claiming a breach to invoke 'self-help' and only perform those obligations it wishes to perform." BB Op. at 2.[14]

Applying this well-settled principle to the instant case, if ESPN believed that Baseball had materially breached the contract by withholding its approval of ESPN's preemption requests, then it had two—and only two—courses · of action. *First*, it could have terminated the contract and commenced litigation against Baseball for total contract damages. This option would have allowed ESPN to show NFL games in place of baseball games because ESPN would no longer be obligated to produce baseball game telecasts on Sunday nights or any other night. *Second*, ESPN could have continued to perform while suing Baseball for partial breach. Under this option, ESPN could not have substituted NFL games for baseball games because it would still be bound by its contractual promise to broadcast baseball games on Sunday nights absent Baseball's prior written approval to preempt those games.[15]

ESPN chose neither of these options. It clearly did not terminate the 1996 Agreement, and, in fact, it does not seek to do so now. Nor did ESPN continue to perform under the agreement. Although ESPN "continued to pay Baseball the entire rights fee called for by the contract and continued to telecast all other baseball games and other programming called for by the 1996 Agreement", *see* ESPN Reply at 4, it did not broadcast baseball games "on each Sunday night of the regular season period" as it was obligated to do under the contract. That ESPN performed its other obligations merely goes to the materiality of ESPN's Sunday night breach; it does not excuse ESPN's nonperformance of a contractual obligation. Again, a party is only excused from performance when it terminates a contract in response to a material breach.

In *Estate of John Lennon v. Leggoons, Inc.*, the defendant also resorted to its own form of self-help in response to plaintiff's alleged breach of the contract. *See Leggoons*, 1997 WL 346733, at *1. *Leggoons* involved a licensing agreement pursuant to which Bag One granted defendant Leggoons the exclusive right "to use the signature of John Lennon and artwork created by John Lennon" in exchange for guaranteed royalty payments by Leggoons. *See id.* Bag One commenced litigation when Leggoons stopped making its contractually required royalty payments. *See id.* Leggoons asserted a counterclaim alleging that Bag One had violated the contract's exclusivity provision by licensing the use of the John Lennon name to another company. *See id.* Leggoons claimed that it was "entitled to stop making [royalty] payments because of Bag One's prior breach of the Agreement." *Id.* Despite Leggoons's "self-help" justification, the court granted Bag One's motion for summary judgment on its contract claim. The court first stated the general principle set forth above: "It is well-settled that the nonbreaching part has a choice when faced with a breach by the other party; it can stop performance and sue for total breach or affirm the contract by continuing to

---

**14.** Indeed, the term "self-help" is commonly used among commentators to refer to a party's right to suspend its performance in response to a material breach and, if the breaching party fails to cure within a specified time, to terminate the contract. *See* Farnsworth, Contracts § 8.15 (3d ed.1999). Thus, "self-help" in the context of commercial contracts is merely another way of describing the first option set forth above—a party can terminate the agreement and sue for total breach.

**15.** In addition, because Baseball denied ESPN's preemption requests in February 1998 and February 1999—more than six months before the September 1998 and September 1999 games—ESPN had ample opportunity to seek injunctive relief from the courts, well before it was required to broadcast the September baseball games.

perform while suing in partial breach."
*Id.* The court then found that

> a party that elects to continue to receive benefits under a contract (in this case, the right to sell Lennon merchandise) cannot unilaterally suspend its performance (in this case, payment of guaranteed royalty) as a means of self-help to remedy a breach by the other party. Leggoons did not terminate the agreement when it learned of Bag Ones' breach, but rather continued to conduct business pursuant to the license. Accordingly, Leggoons affirmed the license and is liable to Bag One for ... unpaid guaranteed royalties.

*Id.*

Other courts faced with claims of "self-help" have reached similar conclusions. *See, e.g., ARP Films*, 952 F.2d at 649 (rejecting plaintiff's contention that its decision to withhold royalty payments and reports was proper "self-help measure designed to force [defendant] to repent from its repudiation, and did not amount to a material breach" because plaintiff could not affirm contract while "refus[ing] to perform its end of the bargain"); *V.S. Int'l, S.A. v. Boyden World Corp.*, 862 F.Supp. 1188, 1197 (S.D.N.Y.1994) (despite defendant's breach and "in view of plaintiffs' affirmance, [plaintiffs'] refusal to perform their end of the bargain by making requisite licensing payments was impermissible" as plaintiffs could not "engage in self-help, by withholding their payment of licensing fees which they were contractually obligated to remit to defendant"); *Richard Subaru, Inc. v. Subaru of New England*, 8 F.Supp.2d 164, 169 (D.Conn.1998) (plaintiff's "self-help solution [of relocating car dealership without permission of dealer] ... was a clear breach of the terms and conditions of exclusivity as well as location of dealership facility"; moreover, "it is beyond dispute that [plaintiff] knew of his obligations ... and he took a roll of the legal dice with his [decision to relocate]").

ESPN argues that *Leggoons* and the other cases cited above are inapplicable because those cases

> involve a factually different context in which, in response to an alleged breach, the non-breaching party continued to accept the benefits of the contract but failed to continue to make payments due under the contract to the breaching party. In such instances, the failure to make payments was held to be a breach of the contract in itself.

ESPN Reply at 4. ESPN's attempt to distinguish these cases is unavailing. Although ESPN "ma[de] payments due under the contract," *see id.*, it failed to fulfill another contractual obligation, namely its explicit duty to produce Baseball game telecasts "on each Sunday night of the regular season period" absent the prior written approval of Baseball, *see* 1996 Agreement, Ex. O to Kheel Aff., at 4. ESPN has essentially drawn a false distinction between the obligation to make money payments and the obligation to render other contractual performances, such as telecasting baseball games. To use ESPN's own words as set forth above, "in response to [Baseball's] alleged breach, [ESPN] continued to accept [the exclusive right to broadcast baseball games] but failed to [show baseball games on Sunday nights during the regular season as it was obligated to do] under the contract." ESPN Reply at 4. Moreover, the failure to show baseball games on Sunday nights, like the failure to make payments, is "a breach of the contract in itself." *Id.* It is undisputed that ESPN preempted Baseball games on six Sunday nights without the prior written approval of Baseball, and the failure to broadcast Sunday night baseball games absent Baseball's approval is a breach of ESPN's obligation to telecast baseball games on Sunday nights.

ESPN's failure to show baseball games on six Sunday nights over a period of two baseball seasons may be immaterial in light of its fulfillment of other contractual obligations such as payment and Wednes-

day night broadcasts. However, ESPN's failure cannot be excused as a form of self-help. Indeed, the phrase "self-help" merely masks the fact that in response to Baseball's alleged breach, ESPN elected the one course of action that was impermissible. It continued the contract but failed to fully perform its obligations under the contract. ESPN performed only those obligations that it chose to perform, and such selective performance is a remedy that contract law does not countenance.

### 3. Terms of 1996 Agreement

Finally, as a matter of contract interpretation, ESPN's theory of "self-help" violates the plain language of the 1996 Agreement in that it allows ESPN to unilaterally determine when preemption is appropriate.

As set forth above, ESPN is obligated to broadcast baseball games on Sunday nights unless it obtains Baseball's permission to preempt those games. The terms of the preemption provision are as follows:

> With the prior written approval of Baseball, which shall not be unreasonably withheld or delayed, ESPN may … preempt any [Baseball game telecast] hereunder, up to a maximum of ten [Baseball game telecasts] per year, for an event of significant viewer interest.

1996 Agreement, Ex. O to Kheel Aff., at 48–49. Although the preemption provision (as well as the rest of the contract) is silent as to who determines whether Baseball is "unreasonably" withholding its approval,[16]

it clearly does not contemplate that the final arbiter of reasonableness will be ESPN. That is, the contract does not permit ESPN to preempt the ten baseball games of its choice. Instead, Baseball has a contractual right to approve or disapprove ESPN's desired substitutions. Although Baseball's decision to withhold approval must be reasonable, ESPN cannot be the judge of whether Baseball is acting reasonably because Baseball's approval right would be rendered meaningless; ESPN could simply preempt the ten games of its choice and determine that any objections Baseball expressed were "unreasonable."

The point of this analysis is that to credit ESPN's self-help theory would effectively appoint ESPN the final arbiter of reasonableness and render superfluous the terms of the preemption provision. If ESPN had a legal right to "self-help" in that it could preempt games whenever it believed that Baseball's disapproval was unreasonable, then Baseball would effectively have no right to disapprove. Under ESPN's theory of self-help, the preemption provision would read as follows: "ESPN may … preempt any [Baseball game telecast] hereunder, up to a maximum of ten [Baseball game telecasts] per year, for an event of significant viewer interest whenever ESPN thinks such preemption is reasonable." This does not, however, comport with the plain language of the contract.[17]

\* \* \* \* \* \*

**16.** That the parties failed to provide for any method of dispute resolution in the foreseeable event they disagreed as to whether Baseball's disapproval was reasonable is surprising to say the least. It is unfortunate, as evidenced by this litigation, that the contract did not set forth a procedure for empaneling arbitrators who could resolve any preemption dispute expeditiously and fairly. Indeed, the parties could have explicitly named an arbitrator or a panel of arbitrators in the contract rendering dispute resolution that much more efficient and expedient.

**17.** Although to some extent this reading can be seen as appointing Baseball the final arbi-

ter of its own reasonableness, that is not the case. Because the parties failed to provide for any method of dispute resolution, the final arbiter with respect to the preemption provision is the court. As an academic matter, the issue then becomes which party bears the burden of commencing litigation.

In the instant case that burden properly falls on ESPN for two reasons. *First,* it is ESPN who seeks to alter the status quo by requesting an exemption from its duty to perform a contractual obligation. *Second,* the provision contemplates that Baseball will perform, or fail to perform, first in time by either granting or withholding its approval of

For all the foregoing reasons, ESPN had no right to engage in its version of "self-help" regardless of whether Baseball unreasonably withheld its approval of ESPN's preemption requests. Accordingly, ESPN breached the 1996 Agreement as a matter of law when it preempted baseball games in September 1998 and September 1999 without Baseball's prior written approval. Whether ESPN's breaches are material is a matter of fact for the jury to determine.

### E. Material Breach by Baseball

I note that in the event the jury finds both that Baseball breached the 1996 Agreement by unreasonably withholding its approval of ESPN's preemption requests and that such a breach was material, the fact that ESPN breached the contract as a matter of law is inconsequential for the following reason.

 "Under New York law an action for breach of contract requires proof of (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages". *See Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525 (2d Cir.1994). My ruling that ESPN breached the 1996 Agreement as a matter of law eliminates Baseball's need to prove the third element listed above—"breach by the other party." In order to maintain a breach of contract claim, however, Baseball must also prove the second element listed above—"performance of the con-

tract." [18] If the jury determines that Baseball materially breached the 1996 Agreement, Baseball cannot maintain a contract claim against ESPN because it has not substantially performed under the contract. Conversely, in the event Baseball's withholding of approval under the contract is found to be reasonable or a nonmaterial breach, Baseball has substantially performed under the contract, and thus it can maintain a claim for breach of contract against ESPN.

### III. Baseball's Motions in Limine Regarding the Interpretation of the Preemption Provision

The following two motions in limine generally concern the admissibility of argument and evidence related to the preemption provision. The meaning of this provision is at the heart of the dispute between ESPN and Baseball.[19]

### A. Baseball's Motion in Limine to Preclude ESPN's Arguments that Baseball Had No Right to Disapprove a Preemption Request for an Event of Significant Viewer Interest and Evidence in Support Thereof

ESPN contends that the preemption provision at issue in this litigation "requires approval of a preemption request, unless Baseball can reasonably say that the preempting event is not an event of significant viewer interest." ESPN Op. at

ESPN's requests for preemptions. Accordingly, and in compliance with contract principles, if ESPN believes Baseball is in breach it must either terminate and sue for total breach or continue the contract and sue for partial breach. If the parties had wanted to allocate the burden differently, they could have drafted a different preemption provision. For example, Baseball would bear the burden of commencing litigation under the following construction: "ESPN may ... preempt any [Baseball game telecast] hereunder, up to a maximum of ten [Baseball game telecasts] per year, for an event of significant viewer interest, provided that ESPN is not unreasonable with respect to which baseball games it chooses to preempt."

18. Element one, the existence of a contract between the parties, is undisputed. With respect to element four, this discussion assumes that Baseball can prove at least nominal damages.

19. As set forth above, the preemption provision states as follows:

With the prior written approval of Baseball, which shall not be unreasonably withheld or delayed, ESPN may also preempt any [Baseball game telecast] hereunder, up to a maximum of ten [Baseball game telecasts] per year, for an event of significant viewer interest.

5. Thus, ESPN contends that "if the preempting event is 'an event of significant viewer interest,' then approval may not be withheld." *Id.* In contrast, Baseball argues that under the plain language of the contract, even if a preempting event is one of significant viewer interest, Baseball may still reasonably disapprove ESPN's preemption request. *See* BB MIL; BB Reply.

In this motion, Baseball essentially is asking the Court to construe the meaning of its approval right under the preemption provision. Specifically, Baseball seeks, pursuant to Federal Rules of Evidence ("FRE") 402 and 403, to preclude ESPN from offering its interpretation of the approval right, namely that Baseball is not permitted to disapprove a preemption request for an event of significant viewer interest. Baseball also seeks to preclude ESPN from offering parol evidence with respect to the meaning of Baseball's contractual approval right.

### 1. Preclusion of ESPN's Interpretation of Approval Right

 Baseball argues that the language of the preemption provision is clear and unambiguous with respect to Baseball's approval right and, as a result, ESPN should be prevented from offering contrary interpretations of that language to the jury. *See* BB MIL at 6; BB Reply at 5.

 It is a well-settled principle of contract law that "[a] court can decide the proper interpretation of language in a contract when the language is unambiguous and reasonable persons could not differ on its meaning." *American Home Assurance Co. v. Baltimore Gas & Elec. Co.,* 845 F.2d 48, 50–51 (2d Cir.1988); *see also Rothenberg v. Lincoln Farm Camp, Inc.,* 755 F.2d 1017, 1019 (2d Cir.1985) ("Where the language of the contract is unambiguous, and reasonable persons could not differ as to its meaning, the question of interpretation is one of law to be answered by the court."). Accordingly, if the language of the preemption provision is unambiguous

with respect to Baseball's approval right, this Court may decide the proper interpretation of that right.

 Ambiguity is also a question of law to be determined by the court. *See Thomas De La Rue AG v. United States Banknote Corp.,* 979 F.Supp. 968, 971 (S.D.N.Y.1997) ("Under New York law, the question of whether the language of a contract is ambiguous is a question of law for the court.") (citing *Seiden Assocs., Inc. v. ANC Holdings, Inc.,* 959 F.2d 425, 429 (2d Cir.1992)). Contract language is ambiguous where

> it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.

*Seiden Assocs.,* 959 F.2d at 428 (internal quotations omitted). In contrast, contract language is unambiguous where it "has a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference in opinion." *Id.* (alteration in original). Moreover, contract language "is not made ambiguous simply because the parties urge different interpretations. Nor does ambiguity exist where one party's view strain[s] the contract language beyond its reasonable and ordinary meaning." *Id.* (internal quotation omitted) (alteration in original).

This contract is unambiguous with respect to Baseball's approval right. As Baseball argues, the plain and ordinary language of the clause has a definite and precise meaning; ESPN can preempt baseball games for events of significant viewer interest if and only if Baseball grants *"prior written approval."* 1996 Agreement, Ex. O to Kheel Aff. at 48 (emphasis added). Although there is ambiguity with respect to the meaning of an

"event of significant viewer interest" and there are fact issues as to whether Baseball "unreasonably withheld" its approval in 1998 and 1999, Baseball has the right to disapprove preemption requests for events of significant viewer interest as long as its disapproval is reasonable.[20]

ESPN's contrary interpretation renders the phrase "with the prior written approval of Baseball" superfluous. That is, if Baseball cannot disapprove events of significant viewer interest, then as long as the event is significant, prior approval from Baseball is unnecessary and meaningless. ESPN's interpretation also strains the language and construction of the preemption provision. Read as ESPN urges, the term "'shall not be unreasonably withheld' relates to [Baseball's] determination of whether a potential preempting event is or is not 'an event of significant viewer interest'" not to Baseball's approval. ESPN Op. at 4. ESPN would have the provision read as follows:

> ... ESPN may also preempt any [Baseball game telecast] hereunder, up to a maximum of ten [Baseball game telecasts] per year, for an event of significant viewer interest and Baseball must not unreasonably withhold its determination that the preempting event is of significant viewer interest.

Although this might be a perfectly reasonable way to structure approval rights under a preemption provision, it is not how the parties structured and drafted the provision at issue here. As a result, ESPN's proposed construction violates basic principles of contract law and cannot be permitted. *See United Nat'l Ins. Co. v. Waterfront New York Realty Corp.*, 994 F.2d 105, 109 (2d Cir.1993) (finding no ambiguity where alternative interpretation "would violate the principle that meaning and effect should be given to all terms of a contract"). *See also Rothenberg*, 755 F.2d

at 1019 ("[A]n interpretation that gives reasonable and effective meaning to all the terms of a contract is generally preferred to one that leaves a part unreasonable or of no effect"); *Two Guys from Harrison–N.Y., Inc. v. S.F.R. Realty Assocs.*, 63 N.Y.2d 396, 482 N.Y.S.2d 465, 468, 472 N.E.2d 315 (1984) ("In construing a contract, one of a court's goals is to avoid an interpretation that would leave contractual clauses meaningless.").

Because the language of the preemption provision unambiguously allows Baseball to reasonably disapprove events of significant viewer interest, ESPN is precluded from arguing to the contrary.

### 2. Preclusion of Parole Evidence Regarding Approval Right

Similarly, because the preemption provision is unambiguous with respect to Baseball's approval right, ESPN is also precluded from offering parol evidence with respect to the meaning and interpretation of Baseball's approval right. *See Seiden Assocs.*, 959 F.2d at 428 ("If the language unambiguously conveys the parties' intent, extrinsic evidence may not properly be received....").

### 3. Integration Clause

The 1996 Agreement includes a broad integration clause which provides that the contract "supersedes all prior contemporaneous agreements and understandings of the parties relating to the subject matter hereof." 1996 Agreement, Art. X.Q. The integration clause also explicitly terminates a 1994 agreement between the parties that immediately preceded the 1996 Agreement: "[T]he [Prior Agreement and an addendum to the Prior Agreement] are hereby terminated ... [and] neither party shall have any further rights, obligations or liabilities pursuant to [the Prior Agreement]." *Id.* Based upon this integration

---

**20.** That is not to say that the significance of the preempting event is irrelevant to the reasonableness of Baseball's refusal. Indeed, where an event is of great significance—however that term is ultimately defined by the jury—there may in fact be no reasonable grounds on which Baseball can refuse ESPN's request for preemption.

clause, Baseball seeks to preclude ESPN from arguing that prior agreements between the parties were "incorporated" into the 1996 Agreement in any way. BB MIL at 3–5; BB Reply at 6.

New York law prohibits the incorporation of extrinsic writings into an agreement unless those writings are specifically incorporated by reference. *See PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1201 (2d Cir.1996). In light of the integration clause which explicitly extinguishes all prior agreements between the parties, ESPN cannot argue that prior agreements are "incorporated" into the 1996 Agreement. This does not mean, however, that evidence of prior agreements between the parties is necessarily inadmissible. Under New York law, "[e]xtrinsic or parol evidence is admissible notwithstanding [an integration] clause where it would not modify or contradict the terms of a contract, but would explain certain ambiguities in the contract." *Telemundo Group, Inc. v. Alden Press, Inc.*, 181 A.D.2d 453, 580 N.Y.S.2d 999, 1000 (1st Dep't 1992). Thus, to the extent evidence of prior agreements between the parties would help explain ambiguities in the 1996 Agreement, it is admissible.

### 4. Evidence from 1989

In its opposition to Baseball's motion, ESPN argues that certain evidence from 1989 is relevant to the fact issue of whether Baseball unreasonably withheld approval of ESPN's preemption requests in 1998 and 1999. *See* ESPN Op. at 13. Specifically, ESPN contends that documents and testimony from 1989 "demonstrate that Baseball was perfectly willing to step aside for the NFL on a string of consecutive Sunday nights in August and September, and thus are independently relevant to refute Baseball's after-the-fact argument

that the loss of three Sunday night baseball telecasts in September is so damaging to Baseball that it could not be accepted." *Id.*

In its reply, Baseball seeks exclusion of the 1989 evidence arguing that "[t]he fact that ten years ago, before Sunday Night Baseball had ever aired much less become established as a popular season-long exclusive national Baseball Showcase, Baseball agreed to a limited side-letter, is neither 'damaging' as ESPN contends nor, given the totally different time and context, even admissible." BB Reply at 8.

I agree with Baseball. Not only is Baseball's 1989 side-letter agreement to a limited number of additional preemptions so attenuated as to be irrelevant,[21] but its negligible probative value is far outweighed by the confusion and added trial-time it would create. Accordingly, the 1989 side-letter and any related documents and testimony are inadmissible pursuant to FRE 402 and 403.

### B. Baseball's Motion in Limine to Preclude Evidence Relating to the Substitution of Six Friday Night Baseball Games During the 1993 Baseball Season

"One of the central issues in this case is whether Baseball unreasonably withheld its approval of ESPN's request to preempt September Sunday Night Baseball Games to show regular season [NFL] games." BB MIL at 1. In an effort to show that Baseball's disapproval of ESPN's requests for preemption in 1998 and 1999 was unreasonable, ESPN plans to introduce evidence of "Baseball's past preemption approvals as evidence of the parties prior course of dealing, to aid the jury in interpreting the meaning of the disputed preemption provision." ESPN Op. at 3.

---

**21.** Indeed, not only was "Sunday Night Baseball" as we know it nonexistent at the time of the 1989 letter agreement, but the letter agreement did not even call for true "preemption". Rather, it allowed ESPN to telecast baseball games on Sunday afternoons rather than Sunday evenings on a limited number of nights in August and September. *See* JPTO, ESPN Contentions, at 15.

In this motion, Baseball seeks to exclude, pursuant to FRE 402 and 403, evidence regarding the substitution of six hockey and golf games for six baseball games on Friday nights during the 1993 baseball season. Baseball argues that the 1993 substitutions were not preemptions for events of significant viewer interest but were instead "inventory reductions" pursuant to a March 1991 letter agreement between the parties. Baseball argues that because the 1993 substitutions were not preemptions, they are irrelevant to the instant dispute: "Baseball does not dispute that the above-described alternative programming was substituted in 1993 for Baseball games on Friday nights, but strongly disagrees that all of the substitutions were preemptions under the preemption provision in the 1990 Agreement." BB MIL at 2–3. Baseball bases its argument on deposition testimony and other discovery that it contends demonstrates that the parties did not consider the 1993 substitutions to be "preemptions" for events of significant viewer interest.

In response, ESPN claims that Baseball has "grievously misrepresent[ed] the evidentiary record on this issue." ESPN Op. at 2. According to ESPN, the evidence demonstrates that the substitutions were preemptions for events of significant viewer interest under the 1990 Agreement between the parties and not inventory reductions as Baseball argues.

In support of its motion, Baseball cites the testimony of its Rule 30(b)(6) witness, Bernadette McDonald, ESPN's Rule 30(b)(6) witness, Milt Lawrence, and Loren Matthews, formerly of ESPN's Programming Department.

McDonald, Director of Baseball's Broadcast Operations, testified that in 1993 ESPN had a right to reduce inventory that was separate from its ability to request preemption for events of significant viewer interest. See 8/19/99 Deposition Transcript of Bernadette McDonald ("McDonald Dep.") at 39. According to McDonald, if ESPN asked to substitute baseball programming scheduled for a Tuesday, Friday or holiday during that time period, the substitution was considered an inventory reduction not a preemption for an event of significant viewer interest. See id. McDonald testified that "[i]n those years, ... they were allowed to reduce inventory, so we looked at it as a reduction of inventory." Id. at 41. McDonald never questioned whether the programming sought to be telecast in place of baseball games was an event of significant viewer interest because, under the reduction clause, ESPN could cancel baseball games regardless of whether those games were replaced with events of significant viewer interest. See id. at 43–44.

Milt Lawrence, a former ESPN employee, also testified that the Friday night baseball games that were canceled in 1993 were canceled pursuant to the March 12, 1991 letter agreement and not the preemption provision. See 9/3/99 Deposition Transcript of Milt Lawrence ("Lawrence Dep.") at 96–97. Loren Matthews corroborated Lawrence's statement. Matthews testified that the relevant 1993 Friday baseball games were canceled and replaced with other sports programming as part of "an inventory reduction." See 9/3/99 Deposition Transcript of Loren Matthews ("Matthews Dep.") at 195.

In its opposition to Baseball's motion, ESPN cites to the deposition testimony of Steven C. Risser, ESPN's "point person" with respect to the 1993 Friday substitutions. Risser, ESPN's Vice President of Programming, testified that the 1993 Friday substitutions were preemptions. See 9/29/99 Deposition of Steven C. Risser ("Risser Dep.") at 213. Risser also pointed to the fact that the total number of Friday substitutions in 1993 was seven, which corresponds exactly to the six preemptions allowed under the Agreement plus one preemption which was handled via a side letter agreement.[22] See id. at

---

**22.** Although the number of seasonal inventory reductions contemplated in the March 12,

214–15. Although this numerical match-up supports ESPN's argument that the 1993 substitutions were in fact preemptions, Risser's testimony regarding the procedures followed in seeking those substitutions cuts the other way. Risser testified that in 1993 he would verbally notify Baseball of ESPN's intent to substitute a particular game, and he would follow his verbal communication with a confirming note. *See* Risser Dep. at 219–21. This is contrary to the procedure set forth in the preemption provision which requires that ESPN obtain the written approval of Baseball ten days in advance of the substitution.[23]

ESPN also argues that both Matthews and Lawrence were initially confused by opposing counsel's questions regarding the March 1991 letter and its relationship to baseball games substituted in 1993. ESPN Op. at 7–10. ESPN cites testimony offered by Matthews and Lawrence later in their depositions in which they essentially retract their earlier testimony on this subject. For example, although Matthews initially testified that the 1993 substitutions were inventory reductions, he later states that he cannot recall whether the Friday substitutions were inventory reductions or preemptions pursuant to the "telecast agreement." Matthews Dep. at 210. Similarly, Lawrence stated that he was "confused" when he testified that the 1993 substitutions were made pursuant to the March 1991 letter, and that he had no knowledge of the contents of that letter or how it related to the 1993 substitutions. *See* Lawrence Dep. at 153–54.

Finally, ESPN attempts to discredit McDonald's testimony that the 1993 substitutions were inventory reductions by pointing to numerous memoranda in which she uses the term "preempt" with regard to the 1993 Friday substitutions. *See* BB Op. at 6–7; Exs. B–K to 10/24/99 Affidavit of Eric J. Lobenfeld in Opposition to Motion to Preclude Evidence Relating to the Substitution of Six Friday Night Baseball Games During the 1993 Season. However, ESPN's argument is unpersuasive in light of McDonald's testimony that she used the word "preemption" generally to mean the substitution of programming rather than to indicate "preemption for an event of significant viewer interest." McDonald Dep. at 54.

After reviewing the materials submitted by the parties, and after reviewing the full deposition testimony of the relevant witnesses, I conclude that evidence relating to the 1993 substitutions is inadmissible pursuant to Rules 402 and 403 for the following reasons.

*First*, ESPN desires to use the 1993 substitutions as examples of prior instances in which Baseball approved preemption for events of significant viewer interest "to aid the jury in interpreting the meaning of the disputed preemption provision in this case." ESPN Op. at 3. There is no question that evidence of prior substitutions pursuant to the contractual preemption provision is relevant to the interpretation of the phrases "unreasonably withheld" and "event of significant viewer interest." Based on the record before me, however, I cannot conclude that the 1993 substitutions were preemptions for events of significant viewer interest. Nor can I conclude that they were inventory reductions. There is simply no consensus among the witnesses on which to base either finding. Indeed, two of ESPN's own witnesses could not definitively say that the 1993 substitutions

1991 letter is not set forth explicitly, it is substantially greater than six. *See* JPTO at ¶ 37 (original number of 1994 games was 175) and March 12, 1991 letter (at least 115 games will be shown each year).

**23.** Moreover, ESPN's Lawrence testified that with respect to one of the baseball games substituted in 1993, he sent a notification memorandum to McDonald seven days prior to the substitution. *See* Lawrence Dep. at 154. The seven-day time period comports with the notice requirements set forth in the March 12, 1991 inventory reduction letter, not the ten-day time-period set forth in the preemption provision of the 1996 Agreement.

were preemptions, and all of Baseball's witnesses believed they were inventory reductions. This is not a matter that could be resolved by an evidentiary hearing. Upon review of the evidence, I credit the testimony of all the relevant witnesses. Their conflicting views regarding the 1993 substitutions are not a result of dishonesty or bad faith. Rather, they reflect a genuine misunderstanding regarding events that took place five years ago. I have no doubt that in 1993 some people believed ESPN's substitutions were made pursuant to the March 1991 letter and others believed they were preemptions pursuant to the telecast agreement. Such uncertainty—an uncertainty that cannot be resolved without substantial effort and guesswork by this Court—drastically undermines the probative value of such evidence and renders it inadmissible pursuant to Fed. R.Evid. 402.

*Second*, pursuant to Fed.R.Evid. 403, I decline to allow the jury to determine whether the 1993 substitutions were preemptions. The probative value of such an exercise is vastly outweighed by the confusion and delay that would inevitably result from conducting a trial within a trial.

*Third*, the exclusion of the 1993 substitutions does not prejudice ESPN's ability to introduce other, better evidence of the parties' prior course of dealings with respect to the disputed preemption provision. For example, under the 1994 Agreement, ESPN requested and Baseball approved five preemptions of baseball games for hockey and soccer games. *See* JPTO ¶ 42. This evidence is far more reliable and probative than the 1993 substitutions and it does not create a risk of confusion or delay.

## IV. Proof of Baseball's Motive in Withholding Approval of ESPN's Preemption Requests

The following two motions in limine—one by Baseball and one by ESPN—concern the admissibility of argument and evidence regarding Baseball's motives for disapproving ESPN's preemption requests.

### A. Baseball's Motion in Limine Concerning "Improper Motive" Contentions and Evidence

#### 1. Background

As set forth above, one of the most critical issues to be determined by the jury in this case is whether Baseball unreasonably withheld its approval of ESPN's requests for preemption of baseball games in September 1998 and September 1999. Baseball contends that its refusals to grant ESPN's preemption requests were based on valid business justifications and thus were reasonable under the terms of the 1996 Agreement. In contrast, ESPN claims that Baseball "unreasonably withheld consent to ESPN's preemption requests in a blatant attempt to extract extra-contractual concessions from ESPN amounting to millions of dollars and various other additions and modifications to the 1996 Agreement." ESPN Op. at 1. In short, ESPN argues that Baseball's proffered business justifications are pretextual, and that Baseball's true motive for denying ESPN's preemption requests was its desire to force a renegotiation of the 1996 Agreement on terms more favorable to Baseball. *Id.* at 5–6.

ESPN's argument regarding Baseball's improper motives is based primarily upon two letters sent by Baseball to ESPN in 1998 and 1999. The first letter, dated April 15, 1998, is a response to an April 2 letter from ESPN and states in pertinent part:

> To follow-up on your letter of April 2, we believe your proposal falls significantly short of what we would consider necessary to resolve this matter with you. What you are really asking us to do is waive certain of your contractual obligations to Baseball to allow you to fulfill obligations you now have to the NFL as a result of your new deal. Below is a list of items which we believe

must be addressed if we are to consider further your request. . . .

*See* 4/15/98 letter from Paul Beeston, President and CEO of Baseball, to Edwin M. Durso, Executive Vice President of Administration of ESPN, Ex. J to Kheel Aff. Included among the "list of items" is a proposal that "MLB regular season rights fees would increase to $43 million per year for the years 1998 to 2002." *Id.* Thus, Baseball's April 15 letter proposes, among other things, that ESPN pay Baseball approximately $8 million more annually for the years 1998 through 2000 and approximately $3 million more annually for the years 2001 and 2002 than is currently required under the 1996 Agreement. *See* 1996 Agreement, Ex. O to Kheel Aff., at 56 and 1997 Amendment (setting fees for 1998 through 2000 at $34.6 million annually and for 2001 and 2002 at $39.9 million annually).

On January 21, 1999, one week before ESPN sought Baseball's approval to preempt three baseball games in September 1999, Baseball sent a second proposal letter to ESPN stating:

> Thank you for meeting with Bob DuPuy and me [on] December 22. We appreciate your comments with respect to the Sunday night issue and have enclosed a proposal which will hopefully bring this matter to a satisfactory conclusion. Essentially what we are proposing is an extension of two years to our present regular-season contract, and, additionally, to provide certain adjustments to the years remaining on that contract.

*See* 1/21/99 letter from Beeston to Steve Bornstein, Chairman and CEO of ESPN, Ex. K to Kheel Aff. Attached to Baseball's January 21 letter is a proposed fee schedule which increases ESPN's payments to Baseball by more than $50 million in each of the remaining years of the 1996 Agree-

ment. In addition, the schedule sets ESPN's fees for the proposed additional years—2003 and 2004—at $125 million and $140 million respectively, a combined increase of more than $180 million when compared with ESPN's annual payment obligations of $39.9 million for the years 2001 and 2002 under the 1996 Agreement.

### 2. Motion in Limine

By its motion, Baseball seeks to preclude ESPN from introducing any evidence or argument that Baseball's disapprovals of ESPN's preemption requests were based upon "improper motives", namely Baseball's alleged desire to extract extra-contractual concessions from ESPN.[24] In particular, Baseball seeks to prevent ESPN from introducing Baseball's April 15 and January 21 letters or otherwise mentioning Baseball's proposed changes to the 1996 Agreement.

In support of its motion, Baseball makes three arguments. *First,* Baseball claims that any evidence regarding "motive is irrelevant in an action for unlawful termination of contract" and must be precluded pursuant to Federal Rule of Evidence ("FRE") 402. BB MIL at 4. *Second,* Baseball contends that its proposed changes to the 1996 Agreement arose "solely out of settlement discussions" between the parties, and therefore any evidence or argument related to those proposed changes must be precluded pursuant to FRE 408 which "prohibits the use of statements or admissions during settlement negotiations as substantive evidence to prove or disprove liability." *Id.* at 4, 9. *Third,* Baseball argues that any evidence regarding Baseball's improper motives is inadmissible under FRE 403 because it would be "highly prejudicial and lead the Court and the jury into consideration of entirely collateral issues." *Id.* at 4.

---

24. Baseball also seeks to preclude evidence or argument that its disapproval of ESPN's preemption requests was in retaliation for ESPN's actions during a 1997 dispute between the parties regarding an unrelated amendment to the 1996 Agreement. *See* BB MIL at 3. Baseball's request to preclude "retaliation" evidence is discussed *infra* Part IV. A.5.

### 3. Relevance of Motive Evidence

 Baseball contends that "motive is irrelevant to a non-breaching party's termination of a contract", and therefore ESPN is precluded from introducing motive evidence pursuant to FRE 402. BB MIL at 4. Baseball's argument is inherently flawed, however, because it misapprehends the purpose of the motive evidence ESPN seeks to introduce.

There is no doubt that motive is irrelevant to the issue of whether a non-breaching party properly terminated a contract where that party has established an independent legal right to terminate. *See, e.g., Refinemet Int'l Co. v. Eastbourne N.V.*, 815 F.Supp. 738, 742 (S.D.N.Y.1993) (finding that where defendant materially breached contract, plaintiff had a legal right to terminate contract, and therefore it was "legally irrelevant whether [plaintiff] was also motivated by reasons which would not themselves constitute valid grounds for termination of the contract"); *Newfield v. General Motors Corp.*, 84 A.D.2d 548, 443 N.Y.S.2d 239 (2d Dep't 1981) (finding that "whether or not [defendant] had an additional reason for terminating [plaintiff's] franchise" was irrelevant where defendant "timely acted to terminate [plaintiff's] franchise upon a cause explicitly set forth in the franchise agreement"). Indeed, each of the cases Baseball cites, including *Refinemet International* and *Newfield*, supports this well-settled legal principle. The problem is that this principle has no application to the instant dispute.

ESPN does not seek to· introduce evidence regarding Baseball's motive for terminating the 1996 Agreement. Instead, ESPN seeks to introduce evidence regarding Baseball's motive for refusing to grant ESPN's preemption requests in an effort to prove that Baseball's refusal was unrea-

sonable and therefore a breach of the parties' contract. Thus, "motive evidence is not being offered to show Baseball's improper termination, but rather that Baseball breached the 1996 Agreement by unreasonably withholding approval of ESPN's preemption requests." ESPN Op. at 4. As ESPN explains in its opposition to Baseball's motion: "[T]he issue of Baseball's purported termination is distinct from the issue of reasonableness in withholding approval." *Id.* at 6.[25]

In order for a jury to determine whether Baseball unreasonably withheld its approval of ESPN's preemption requests, it must first determine why Baseball disapproved. As a result, Baseball's motive for disapproving ESPN's requests—whether it be valid business justifications or a desire to renegotiate the 1996 Agreement—is directly relevant to the critical question of reasonableness. Accordingly, I find that argument and evidence regarding Baseball's motive for withholding its approval of ESPN's preemption requests is admissible under FRE 402.

### 4. Rule 408: Preclusion of Settlement Materials

Baseball also contends that any evidence of its proposed changes to the 1996 Agreement constitutes settlement material and is thus inadmissible under FRE 408 which prohibits the introduction of settlement material to prove liability. Rule 408 provides:

Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or state-

**25.** Moreover, unlike the prevailing parties in *Refinemet International* and *Newfield,* Baseball has not yet established its right to terminate the 1996 Agreement. Before Baseball can prove proper termination, a jury must

first find that ESPN materially breached the parties' contract. Until then, the holdings of *Refinemet International, Newfield* and the other cases Baseball cites are inapplicable.

ments made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

Whether the improper motive evidence ESPN seeks to introduce is precluded by FRE 408 depends upon an analysis of two issues: (i) is the improper motive evidence that ESPN seeks to introduce an offer "in compromising or attempting to compromise" a disputed claim; and (ii) if the disputed evidence is settlement material under FRE 408, is it being offered to prove liability or "for another purpose."

### a. Settlement Material

There is no bright-line rule governing whether evidence constitutes settlement material for purposes of FRE 408. Indeed, "[i]t is often difficult to determine whether an offer is made 'in compromising or attempting to compromise a claim.' Both the timing of the offer and the existence of a disputed claim are relevant to the determination." *Pierce v. F.R. Tripler & Co.*, 955 F.2d 820, 827 (2d Cir.1992).[26]

██ Once a party "is represented by counsel, threatens litigation and has initiated the first administrative steps in that litigation, any offer made between attorneys will be presumed to be an offer within the scope of Rule 408." *Id.* Moreover, courts in the Second Circuit have held that evidence may be considered "settlement material" even where litigation is merely a

possibility. For example, in *Olin Corp. v. Insurance Co. of N. Am.*, 603 F.Supp. 445 (S.D.N.Y.1985), the court found that where the parties "contemplated that litigation might be necessary" certain discussions between the parties constituted settlement negotiations for purposes of FRE 408. *Id.* at 449–50. Similarly, in *Trebor Sportswear Co. v. The Limited Stores, Inc.*, 865 F.2d 506 (2d Cir.1989), the court considered an offer made by defendant to be settlement material even though litigation had not been initiated at the time the offer was made.

In the instant case, Baseball claims that its proposed changes to the 1996 Agreement—including its April 15 and January 21 letters—were settlement offers in an attempt to resolve the NFL/preemption disputes and to thereby avoid litigation. According to Baseball, "immediately after the NFL Dispute arose, the parties [became] engaged in and continue to engage in settlement negotiations to resolve the dispute." BB MIL at 10. Baseball also alleges that "from the outset, both parties recognized that the negotiations might not be successful, rendering litigation a serious possibility." *Id.* In support of its argument, Baseball cites to various documents and deposition testimony which demonstrate both that the parties were discussing resolution of their NFL/preemption dispute, and that both sides were aware that if they failed to resolve their differences litigation would likely ensue. *See* BB MIL at 10–11. Indeed, the introductory language of both the April 15 and January 21 letters is itself evidence that Baseball's proposed changes to the 1996 Agreement arose in the context of settlement discussions with ESPN. *See* 4/15/98 letter, Ex. J to Kheel Aff.; 1/21/99 letter, Ex. K to Kheel Aff.; *see also supra* Part IV.A.1.[27]

---

**26.** Whether Baseball's proposed changes to the 1996 Agreement constitute settlement materials is a question for the court, not a jury. *See Pierce,* 955 F.2d at 820 ("Under Fed. R.Evid. 104(a), preliminary factual questions concerning the admissibility of evidence such

as whether an offer was made in the course of settlement negotiations are to be determined by the court.").

**27.** Baseball also points out that ESPN's own privilege log identifies various documents

Baseball has set forth persuasive evidence that its proposed changes were made during the course of settlement discussions between the parties. However, for the following reason, I decline to find that Baseball's proposals are in fact settlement materials within the rubric of FRE 408 for the following reason.

There is an apparent inconsistency in classifying Baseball's proposals as settlement materials without first deciding whether Baseball unreasonably withheld its consent to ESPN's preemption requests. If ESPN can prove that Baseball withheld its approval out of a desire to extract more favorable contract terms from ESPN, then Baseball's subsequent requests for such terms cannot be considered true attempts at conciliation. Stated somewhat differently, if Baseball created the preemption dispute by improperly withholding its approval in an effort to force a wholesale renegotiation of the contract, then its subsequent efforts to renegotiate are merely a continuation of that improper act and not good faith attempts to resolve a dispute. To rule that Baseball's proposed changes are settlement materials would, in effect, credit Baseball's theory that its withholding of approval was based on valid business justifications. Conversely, to find that Baseball's proposed changes are not settlement materials would credit ESPN's theory that Baseball unreasonably withheld its approval in order to extract substantially more favorable contract terms from ESPN. However, the reasonableness of Baseball's disapproval of ESPN's preemption requests is for the jury to decide. As a result, the Court must be cautious not to preempt the jury's role.

Fortunately, it is possible to resolve Baseball's motion without deciding whether these letters constitute settlement proposals. Assuming, arguendo, that Baseball's proposals are settlement materials,

FRE 408 does not preclude ESPN from introducing those materials at trial for the reasons set forth below.

### b. Admissibility for Purpose of Showing Motive

As set forth above, Rule 408 precludes parties from introducing settlement materials "to prove liability for ... the [disputed] claim or its amount." The Rule does not, however, exclude all settlement evidence from trial: "Evidence of an offer to compromise, though otherwise barred by Rule 408, can fall outside the Rule if it is offered for 'another purpose', i.e., for a purpose other than to prove or disprove the validity of the claim the offers were meant to settle." *Trebor Sportswear Co. v. The Limited Stores, Inc.,* 865 F.2d 506, 510 (2d Cir.1989) (citations omitted). Thus, assuming Baseball's proposed changes are settlement materials pursuant to FRE 408, evidence regarding those proposed changes is admissible if it is offered "for another purpose".

### (1) Policy Underlying Rule 408

Before turning to a determination of whether Baseball's proposed changes are being offered to prove liability or "for another purpose", it is useful to discuss the policy justifications underlying Rule 408.

Rule 408 excludes settlement material offered to prove liability for two reasons. *See* FRE 408, Advisory Committee Notes. The first is a relevance concern, namely that evidence of settlement offers is irrelevant to the issue of liability "since the offer may be motivated by a desire for peace rather than from any concession of weakness or position." *Id.* The Rule reflects a fear that juries will infer an admission of liability from the mere fact that a party was willing to settle its claim. As Judge Weinstein explains, "[t]he almost unavoidable impact of disclosure about compromises is that the jury will consider the

---

from January, March and August of 1998 as privileged materials related to the "MLB Dispute". *See* ESPN's Privilege Log, Ex. L to

Kheel Aff. Two of those documents are identified as "Settlement Proposals." *See id.* at Nos. 82, 83.

**412**

evidence as a concession of liability." *See* Weinstein's Evidence Manual § 7.05(1)(e) (1999). *See also* Wayne D. Brazil, *Protecting the Confidentiality of Settlement Negotiations,* 39 Hastings L.J. 955, 958 (1988) (citing Wigmore for proposition that "an offer to settle evidences only a party's desire to terminate the litigation; it could not support any reliable inference about the merits of the claim or the amount of damages."); *Bank Brussels Lambert v. Chase Manhattan Bank,* 93 Civ. 5298, 1996 WL 71507, *3 (S.D.N.Y. Feb. 20, 1996) ("The rule insures that offers of compromise will not have intrinsic evidentiary value. The rule recognizes that in the give and take of settlement negotiations offers and concessions are made which are inconsistent with the legal and factual positions maintained by the parties.").

The second, and more important, justification for Rule 408's exclusion of settlement materials is the "promotion of the public policy favoring the compromise and settlement of disputes." Rule 408, Advisory Committee Notes. *See also Manko v. United States,* 87 F.3d 50, 54 (2d Cir.1996) ("The primary purpose of Rule 408 is the 'promotion of the public policy favoring the compromise and settlement of disputes' that would otherwise be discouraged with the admission of such evidence.").

### (2) Evidence Offered For "Another Purpose"

▮ ESPN does not intend to offer evidence of Baseball's proposed changes to the 1996 Agreement "to prove that Baseball effectively admitted liability by making a settlement offer." ESPN MIL at 13. "Instead, ESPN seeks to admit the evidence to show Baseball's motive and purpose for withholding approval of the preemption request[s]." *Id.*

In determining the admissibility of settlement materials under Rule 408, the trial court " 'has broad discretion' as to whether to admit evidence of settlement ... offered for 'another purpose.' " *Starter Corp. v. Converse, Inc.,* 170 F.3d 286, 293 (2d Cir. 1999) (quoting *Trebor,* 865 F.2d at 511). "In applying the 'another purpose' exception to Rule 408, the trial judge should weigh the need for such evidence against the potentiality of discouraging future settlement negotiations." *Id.* (internal quotations omitted).

In the instant case, ESPN's need for the disputed evidence far outweighs any potential for discouraging future settlement negotiations. ESPN cannot prove that Baseball's refusal to grant its preemption requests was pretextual without offering evidence of what it alleges was Baseball's true motive— to force a renegotiation of the 1996 Agreement on terms more favorable to Baseball. Put simply, such evidence is central to ESPN's case. In contrast, the potential for discouraging future negotiations is low. The circumstances of this case with respect to the parties' negotiations are unique and unusual, and therefore admission of these materials as motive evidence will not have a chilling, let alone any, effect on settlement negotiations between other parties in other situations.[28]

Moreover, there is absolutely no danger that a jury will mistake Baseball's demands to ESPN as an admission of liability. Baseball's requests for wholesale changes to the parties' agreement on terms substantially more favorable to Baseball do not in any way imply weakness or concession on Baseball's part. To the contrary, the language of Baseball's letters seeking to resolve the NFL/preemption dispute reflect Baseball's conviction that ESPN and not Baseball is liable for breach of contract.

In light of ESPN's substantial need for the disputed materials and the unlikelihood that introduction of such evidence

---

**28.** Indeed, if the jury does in fact conclude that Baseball withheld its approval for preemption based on its desire to renegotiate the 1996 Agreement, permitting Baseball to hide its improper act from the jury through invocation of Rule 408 would frustrate both the purpose of the Rule and the public policy favoring settlement.

will frustrate either of the purposes underlying Rule 408, I find that evidence and argument related to Baseball's proposed changes to the 1996 Agreement is admissible for the "other purpose" of demonstrating Baseball's alleged improper motive.[29]

As set forth above, weighing ESPN's need for the settlement material against the potential for discouraging future settlement negotiations, I find that the settlement materials are admissible in this case for purposes of proving Baseball's alleged improper motive.

### 4. Preclusion of Baseball's Demands Under 403

Baseball contends that evidence of its demands to ESPN should also be precluded pursuant to FRE 403. For all of the reasons set forth above, Rule 403 does not bar admission of the disputed evidence. The probative value of Baseball's demands outweighs any resulting confusion or delay.

Moreover, Baseball's claim that it would be prejudiced by ESPN's use of the terms "extortion" and "extortionate" is mooted by ESPN's agreement not to use those terms. In its opposition brief, ESPN states: "ESPN is willing to concede Baseball's point that the settlement evidence not be described at trial in terms of 'extortion,' and hereby agrees not to do so." ESPN Op. at 15.

### 5. Retaliation Evidence

Baseball also seeks to preclude, pursuant to FRE 402 and 403, evidence or argument that its disapproval of ESPN's pre-emption requests was in retaliation for ESPN's actions during an unrelated 1997 contract negotiation.

In 1997, Turner Broadcast Systems ("TBS"), owner of the Atlanta Braves Major League Baseball club, sought Baseball's permission to convert from a television "superstation" to a national cable television service. BB MIL at 12–13. As a superstation, TBS was congressionally authorized to telecast certain baseball games nationally. *See id.* at 13. Once it became a national cable service, however, TBS could not telecast baseball games nationally unless it obtained a license from Baseball. *See id.* In order for Baseball to grant a telecast license to TBS, it first had to renegotiate certain terms of its telecast agreement with ESPN. *See id.* at 14. According to both parties, those renegotiations "were difficult, frustrating and protracted." *Id.* at 14; *see also* ESPN Op. at 15–16. An agreement was ultimately reached, however, and the parties executed what is now the 1997 Amendment to the 1996 Agreement.

During one of the 1997 renegotiation meetings, Baseball's Commissioner, Allan H. ("Bud") Selig, allegedly made statements "evincing Baseball's desire to 'get even' with ESPN for contentious prior contract negotiations." ESPN Op. at 15. ESPN intends to use these statements to argue that Baseball withheld its approval of ESPN's preemption requests in 1998 and 1999 in "retaliation" for ESPN's behavior in connection with the 1997 contract negotiations.

---

**29.** Baseball argues that *Trebor Sportswear Co. v. The Limited Stores, Inc.,* 865 F.2d 506 (2d Cir.1989), compels the exclusion of settlement materials having any bearing on the ultimate issue of liability. I disagree. In *Trebor,* the settlement document plaintiffs' sought to admit for purposes of combatting a statute of frauds defense was "so closely intertwined" with liability that it would frustrate the purposes of Rule 408 to allow it into evidence for any reason. In excluding the settlement document, the *Trebor* Court clearly limited its holding to the facts and equities of that case. The Second Circuit found that admission of defendant's settlement offer *"under the circumstances of this case"* would "militate against the public policy considerations" favoring settlement. *Id.* (emphasis added). Moreover, the *Trebor* Court explicitly went on to state the general rule set forth above: "[A] trial court has broad discretion as to whether to admit evidence of settlement negotiations for 'another purpose'", and that, in making this determination, the trial court should "weigh the need for such evidence against the potentiality of discouraging future settlement negotiations." *Id.* at 511–12. (internal quotations omitted).

I agree with Baseball that vague statements allegedly made by Baseball's Commissioner more than two years ago in the heat of an entirely separate contract dispute are irrelevant and inadmissible here.[30] Any negligible probative value those alleged statements might have, is vastly outweighed by the confusion and delay introduction of such collateral matters would create. There is no justification for presenting the jury with evidence regarding an unrelated contract or testimony as to what Mr. Selig meant by his frustrated mutterings two years ago. These matters are simply too attenuated to be relevant. Accordingly, ESPN is precluded from introducing evidence and argument regarding Baseball's alleged "retaliatory" motive.

### B. ESPN's Motion in Limine to Preclude Evidence Purporting to Show the Alleged Reasonableness of Baseball's Extortionate Money Demands

As set forth in the preceding section, ESPN intends to argue that "Baseball wrongly used the preemption approval mechanism as leverage to demand wholesale renegotiation of the 1996 Agreement." ESPN MIL at 2. During deposition discovery, ESPN questioned Baseball's witnesses "as to what possible basis there could be for Baseball's contention that it was entitled to demand more than $350 million in additional payments from ESPN." *Id.* at 3. In response, Paul Beeston, Baseball's President and Chief Operating Officer, stated that the increased fee proposals were not unreasonable but were instead based on a telecast valuation study that Baseball had commissioned in late 1998. Beeston testified as follows:

[These figures] were arrived at in consultation with the report and reference to the report of Bortz. So we'll call it the Bortz Report. They were not pulled out of the air. They were not numbers that we said, hey let's see if this works. They were numbers that are defensible. They are numbers that were the result of a lot of study and they were numbers that we put forward in connection with our consultants that made some sense.

8/3/99 Deposition of Paul Beeston, Ex. D to 10/15/99 Affidavit of Eric J. Lobenfeld in Support of ESPN's Motion Regarding Baseball's Extortionate Money Demands, at 173–174.[31]

Following Beeston's testimony, ESPN asked Baseball to produce a copy of the Bortz Report. Baseball refused to produce the Report on the grounds that it was subject to the work-product privilege.[32] ESPN MIL at 4. According to Baseball, "[t]he Bortz Report was commissioned specifically to assist Baseball in developing a settlement proposal to ESPN in the hopes of resolving the dispute over ESPN's preemption of the Sunday Night Baseball games." BB Op. at 4. Therefore, Baseball contends that the Report " 'fall[s] squarely within the work product doctrine as documents prepared by a party in connection with litigation.' " *Id.* at 9 (quoting *Riddell Sports, Inc. v. Brooks*, 92 Civ. 7851, 1995 WL 20260, at *1 (S.D.N.Y. Jan. 19, 1995)).

### 1. Motion in Limine

By its motion ESPN seeks to preclude Baseball from introducing any evidence or argument regarding the reasonableness of its proposed changes to the 1996 Agreement. Specifically, ESPN argues that because Baseball failed to produce the Bortz

---

**30.** I note that neither party identifies the statements that ESPN actually seeks to introduce at trial. They merely refer to statements made by Selig that "evinc[e] Baseball's desire to 'get even' with ESPN." ESPN Op. at 15.

**31.** "Bortz" refers to Bortz Media & Sports Group. BB Op. at 4. According to Baseball,

Bortz is a "well-established third party consultant" that Baseball hired to "value Baseball's telecast rights." *Id.*

**32.** Baseball similarly refused to permit Beeston to discuss the contents or substance of the Bortz Report. ESPN MIL at 4.

Report during discovery, it is barred from relying on that Report as a justification for its requests for increased payments under the contract.

In response, Baseball's primary argument is that all evidence of settlement negotiations between the parties, including Baseball's proposed changes to the 1996 Agreement and the Bortz Report, should be excluded from trial. BB Op. at 2–7. Baseball alternatively argues that in the event this Court allows the introduction of settlement materials at trial, Baseball should be permitted to "refer to the existence of the Bortz report" without having to produce the Report itself. *Id.* at 7 (emphasis added). Baseball contends that the relevant issue is not whether the Report itself is accurate or reasonable, but whether Baseball relied on the Report when it formulated its demands to ESPN. In any event, Baseball maintains that ESPN is not entitled to a copy of the Bortz Report because the Report is subject to work-product protection.

## 2. Discussion

In light of my prior ruling that the disputed materials regarding Baseball's demands are admissible at trial for the purpose of demonstrating Baseball's alleged improper motive, Baseball's argument for the wholesale exclusion of such materials is moot. Baseball's similar contention that the Bortz Report should be excluded pursuant to Rule 408 is also without merit.

With respect to Baseball's assertion of the work-product privilege, however, I find that the Bortz Report was prepared at the request of Baseball's counsel in connection with the possible resolution of anticipated litigation. *See* BB Op. at 7–9. As such, the Report is subject to the work-product doctrine, and it is not discoverable absent a showing of substantial need or waiver. *See Riddell*, 1995 WL 20260 at *1; Fed.R.Civ.P. 26(b)(3). Contrary to ESPN's contention, *see* ESPN MIL 5–9, Baseball did not waive the work-

product privilege when one of its witnesses, Paul Beeston, merely referred to the Report in response to a direct question from ESPN. ESPN itself concedes that Baseball's lawyers precluded Mr. Beeston from discussing the substance of the Report, and there is no claim that other witnesses referred to the Report or that the Report was shared with anyone other than Baseball and its attorneys. ESPN MIL at 4. In addition, Baseball's position prior to this time has been that it would not introduce either the Bortz Report or any other evidence regarding its demands for increased payments from ESPN. Thus, there can be no argument that Baseball has placed the Bortz Report at issue in this litigation.

With respect to Baseball's ability to introduce evidence regarding the Bortz Report at trial, Baseball's suggestion that it be "allowed to refer to the existence of the Bortz Report" without producing the Report to ESPN is well taken. *See* BB Op. at 7 (emphasis added). Baseball contends that "the issue ... ESPN has raised is whether Baseball *believed* its proposals to be reasonable, not whether the proposals or the estimates upon which they were based, were, by some objective standard, reasonable in fact." *Id.* (emphasis added). If ESPN intends to question Baseball's basis for demanding "more than $350 million in additional payments from ESPN", then Baseball should be permitted to answer that it relied upon "the Bortz Report" without having to reveal the substance of that Report. Indeed, the methodologies employed by the Bortz group together with its conclusions regarding the present and future valuation of Baseball are entirely collateral to this litigation. If the contents of the Report are introduced at trial, the result would be unnecessary confusion, delay and prejudice to Baseball. In contrast, the Report itself is of no probative value. It is Baseball's purported reliance on the Report, not the substance of the Report, that is

relevant to whether Baseball had a reasonable basis for its demands.[33]

ESPN does not seriously contend that the substance of the Bortz Report is itself relevant to the litigation. Instead, ESPN raises valid concerns regarding whether the Report "bear[s] any indicia of having been well-researched and well-prepared." BB Reply at 6. ESPN's point is that "[f]or all ESPN knows, the Bortz Report may be nothing more than scribbles on a cocktail napkin." *Id.* To alleviate ESPN's concerns regarding the reliability of the Bortz Report, Baseball is ordered to immediately produce a copy of the Report to this Court for in camera review. If I find that the Bortz Report bears sufficient indicia of reliability, then Baseball may introduce evidence at trial to the effect that it relied on the Report in formulating its demands to ESPN without waiving its asserted work-product protection.[34]

## V. Conclusion

The foregoing rulings address six of the ten pending motions in limine. The remaining motions will be decided prior to trial.

---

33. Because the Report itself is of negligible probative value, ESPN cannot demonstrate the substantial need required to overcome the work-product privilege pursuant to Fed. R.Civ.P. 26(b)(3).

34. To emphasize the limits of this ruling, I reiterate that work-product protection is not absolute. It is a qualified immunity that is waived "when a party to a lawsuit uses it an unfair way that is inconsistent with the principles underlying the doctrine of privilege."

*Granite Partners, L.P. v. Bear Stearns & Co.,* 184 F.R.D. 49, 54 (S.D.N.Y.1999); *see also id.* ("It is well settled that waiver may be imposed when 'the privilege-holder' has attempted to use the privilege as both 'sword' and 'shield.' ") (quoting *In re von Bulow,* 828 F.2d 94, 102 (2d Cir.1987)). Accordingly, if Baseball attempts to introduce the substance of the Bortz Report at trial it will waive the privilege and its ability to withhold the Report.